**Carolyn Harris THIBODAUX, Individually and as Administratrix of the Estate of the minor children, etc., Plaintiff-Appellant,**

v.

**ATLANTIC RICHFIELD COMPANY, Defendant-Appellee.**

No. 76–4216.

United States Court of Appeals, Fifth Circuit.

Sept. 22, 1978.

Rehearing Denied Nov. 8, 1978.

Joseph L. Waitz, Lawrence E. Best, Houma, La., for plaintiff-appellant.

W. K. Christovich, New Orleans, La., for Atlantic Richfield Co.

Before CLARK, FAY and VANCE, Circuit Judges.

FAY, Circuit Judge:

This lawsuit arises from an unfortunate mishap which occurred on a Louisiana canal on June 10, 1974. On that day Van Thibodaux was employed as a workman by H. B. Buster Hughes, Inc. (Hughes), an oil field maintenance and construction company. Hughes contracted with Atlantic Richfield Company (ARCO)[1] to supply a four-man crew to perform maintenance work on piping and flow lines at the Bully Camp Field. Mr. Julius Hebert, ARCO's production foreman in Southeast Louisiana, requested Hughes to supply a crew of men, a vessel to transport the crew to the Bully Camp Field which was accessible only by water, and a pollution pan to be placed on a sunken barge[2] in the canal. The Hughes employees loaded the vessel[3] and equipment onto a truck and transported them to the canal, where they were offloaded. Despite the fact that the vessel had a capacity of only 900 pounds, the crew and equipment were placed aboard, and, with Hebert at the controls, the vessel was launched. The vessel sank a short distance from the launching area and Van Thibodaux drowned.

Carolyn Thibodaux, widow of the deceased, individually and on behalf of her four minor children, instituted an action against Hughes and its insurer, Employers Mutual Liability Insurance Company of Wisconsin, seeking recovery under the Jones Act, general maritime law, and the Longshoremen's and Harbor Workmen's Compensation Act, 33 U.S.C. §§ 901, et seq.

(hereinafter referred to as the LHWCA). An action was also filed against ARCO under the general maritime law and the LHWCA alleging that ARCO negligently caused the death of the deceased. These actions were later consolidated upon motion of the plaintiffs. The plaintiffs' motion to add various employees as additional defendants was denied. All parties moved for summary judgment, and, after conducting a hearing, the trial court granted the defendants' motions, holding that (1) the deceased was not a seaman and hence no Jones Act recovery could be had (2) the deceased was not engaged in "maritime employment" within the meaning of 33 U.S.C. § 902(3) and hence no action exists under the LHWCA and (3) because ARCO is a statutory employer of the deceased within the meaning of LSA-R.S. 23:1061 any liability of ARCO is exclusively governed by the Louisiana Workmen's Compensation Act.

During the pendency of this appeal, the plaintiffs settled their claims against Hughes and its insurer, Employers Mutual Liability Insurance Company of Wisconsin.[4] Therefore, the only issue remaining in this appeal is whether the court was correct in granting summary judgment in favor of the defendant ARCO. We have concluded that the trial court correctly held that there is no genuine issue as to a material fact concerning the deceased's failure to meet the "maritime employment" requirement of the LHWCA. The LHWCA is therefore not applicable to this case. We further conclude, however, that the trial court erroneously held that any liability of ARCO is to be governed exclusively by the Louisiana Workmen's Compensation Act, and, accordingly, this case must be remanded for such further proceedings as may be necessary to resolve the rights and liabilities of the parties under general maritime law.

1. ARCO is a domestic oil corporation which engages in oil exploration and the production and refining of oil and related products.

2. The record reveals that the sunken barge served as a dock, or more precisely, as a tank battery platform.

3. Hughes owned the vessel in question.

4. The plaintiffs received $40,000 in settlement of all claims against "H. B. 'Buster' Hughes, Inc., its agents, employees, officers and insurers, including any and all insurers and particularly Employers Mutual Liability Insurance Company of Wisconsin . . . ."

## 1. LHWCA

As we have stated, the plaintiffs settled their claim for any compensation benefits under the LHWCA with Hughes, the employer of the deceased, prior to the time that this case was orally heard. Since the compensation liability of a contracting employer for injury or death sustained by an employee of a subcontractor pursuant to 33 U.S.C. § 904 is secondary only, *Probst v. Southern Stevedoring Co.*, 379 F.2d 763 (5th Cir. 1967), it would appear at first blush that the settlement agreement takes the issue of the applicability of the LHWCA out of this case. This conclusion does not follow. If the LHWCA is applicable to this case, and if it is determined that the deceased was a "borrowed employee" or "borrowed servant" of ARCO, the plaintiffs exclusive remedy against ARCO will lie in the recovery of compensation benefits under the Act. *See, Gaudet v. Exxon Corp.*, 562 F.2d 351 (5th Cir. 1977). If that be the case, we need not consider whether the exclusive remedy provision of the Louisiana Workmen's Compensation Act prevents the plaintiffs from pursuing a general maritime action for wrongful death.

An employee now falls within the ambit of the LHWCA only if he can satisfy the dual tests of "situs" and "status" set forth in the Act. *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). The relevant provisions of the Act provide as follows:

> Compensation shall be payable . . . in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States . . . . 33 U.S.C. § 903(a).
> The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or

member of a crew of any vessel, or any person engaged by the master to load or unload any small vessel under eighteen tons net. 33 U.S.C. § 902(3).

There is no dispute that the situs test is satisfied in that the deceased met his death upon navigable waters.[5] The sole question, therefore, with respect to the applicability of the Act is whether there is a genuine issue of material fact concerning the status of the deceased at the time of his death. In other words, is there a genuine issue of material fact as to whether the deceased was engaged in "maritime employment" within the meaning of the Act when the vessel sank? We must look to *Caputo, supra*, for guidance. In that case, compensation awards to respondents Blundo and Caputo had been affirmed by the Court of Appeals. Blundo, a "checker", was responsible for checking and marking cargo being unloaded from a vessel or from containers taken from the vessel. While marking cargo from a container, he slipped on the icy pier and was injured. Caputo was a member of a regular stevedoring "gang" for another company but was temporarily hired by Northeast Marine Terminal Company to load and unload containers, barges, and trucks at the pier. He was injured while loading ship's cargo into a truck. The Court in *Caputo* recounted the history of both the LHWCA and the 1972 amendments thereto, and we will therefore not repeat what is said there in detail. After noting that neither the text of the Act nor its legislative history defines the phrase "maritime employment", the Court concluded that both Blundo and Caputo satisfied the "status" test of eligibility for LHWCA compensation, seemingly applying a separate test to each.

The Court reasoned that in extending coverage shoreward in the 1972 amendments, Congress intended to provide coverage for those involved in modern cargo handling techniques, such as the unloading of a container. Blundo met the status re-

---

5. The parties do not dispute that the canal in which the deceased met his death was indeed "navigable" within the meaning of the statute.

quirement because at the time of the injury his activities were "clearly an integral part of the unloading process . . ." 432 U.S. at 271, 97 S.Ct. at 2361. Therefore, Blundo's activity at the time of injury qualified him for LHWCA benefits. As to the claimant Caputo, the Court recognized that the Congressional goal of adapting the Act to accommodate modern cargo handling techniques was irrelevant because Caputo was injured while loading cargo into a truck on the pier. *Id.* at 271–272, 97 S.Ct. 2348. However, the Court discerned a distinct Congressional objective which supports the status of Caputo as a covered employee. The Court Stated:

> The Act focuses primarily on occupations—longshoreman, harbor worker, ship repairman, shipbuilder, shipbreaker. Both the text and the history demonstrate a desire to provide continuous coverage throughout their employment to these amphibious workers who, without the 1972 amendments, would be covered for only part of their activity. It seems clear therefore, that when Congress said it wanted to cover 'longshoremen,' it had in mind persons whose employment is such that they spend at least some of their time in indisputably longshoring operations and who, without the 1972 amendments, would be covered for only part of their activity.

*Id.* at 273, 97 S.Ct. at 2362. Therefore, the Court recognized occupation as an alternative test to support status as a maritime employee.[6]

With the alternative tests of occupation and activity at the time of injury in focus, we now proceed to determine whether the district court properly granted summary judgment on the issue of status in the case at bar. At the outset we recognize that summary judgment is indeed a "lethal weapon"[7] and is not to be used as a means to deprive a litigant of his right to trial by jury. *Whitaker v. Coleman*, 115 F.2d 305 (5th Cir. 1940). Summary judgment is proper only when there is no genuine issue as to a material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860 (5th Cir. 1975). The Court should liberally construe all pleadings in favor of the party against whom the motion is made, *Dassinger v. South Central Bell Telephone Co.*, 505 F.2d 672 (5th Cir. 1974), and the motion should be granted only when there is no substantial evidence in support of the nonmovant's position, or when "the tendered evidence is in its nature too incredible to be accepted by reasonable minds, or that *conceding its truth, it is without legal probative force.* . . ." *Whitaker, supra,* at 306. (emphasis added).

The plaintiffs contend that there is ample evidence in the record to withstand summary judgment on the "maritime employment" issue.[8] The plaintiffs argue that the record reveals that the deceased was transported by vessel to his work locations approximately 80% of the time, that the vessel was offloaded from a truck into the canal with the assistance of the deceased, that the

---

**6.** For an excellent discussion of the tests of status fashioned by the Supreme Court in *Caputo, see, Longshoremen, Longshoring Operations, and Maritime Employment: A Dual Test of Status After Northeast Marine Terminal Co. v. Caputo,* 64 Va.L.Rev. 99 (1978).

**7.** *Brunswick v. Vineberg,* 370 F.2d 605, 612 (5th Cir. 1967).

**8.** The plaintiffs have not addressed the "borrowed servant" issue as it may relate to the exclusive remedy provision of the LHWCA. 33 U.S.C. § 905(a). The plaintiffs' preoccupation with establishing coverage under the Act has perhaps obscured the impact of such coverage upon their right to pursue a third party action

against ARCO, should ARCO in fact be determined to be a "borrowing employer." Because we have concluded that the exclusive remedy provision of the Louisiana Workmen's Compensation Act does not prevent the plaintiffs from pursuing their general maritime claim for wrongful death, it would obviously be to the plaintiffs advantage to now change hats and contend that the LHWCA is inapplicable to this case. ARCO asserts that the Act does not apply, but, alternatively, if it does apply, coverage under the Act provides the exclusive remedy in the case at bar. ARCO would probably also prefer to change course at this time and argue in the first instance that the Act does apply.

deceased loaded equipment into the vessel, and that a pollution pan was to be installed on a sunken barge.[9] ARCO contends that aside from the momentary placement of the pollution pan on the sunken barge, the only connection of the deceased with maritime activity was the necessity of traveling upon navigable waters to reach the Bully Camp Field, where the crew's maintenance work was to be performed.

The record is abundantly clear that even if the facts as stated by the plaintiffs are true, as a matter of law the deceased was not engaged in "maritime employment" as measured by the alternative tests of status sanctioned in *Caputo*. There is no substantial evidence that the deceased spent at least part of his time "indisputably"[10] as a longshoreman, harbor worker, ship repairman, shipbuilder, or shipbreaker. The record overwhelmingly establishes that the occupation of the deceased was that of an oilfield construction and maintenance man. The deceased simply is not the amphibious worker sought to be protected by the 1972 amendments to the LHWCA because his work was performed on land. The locality of the work sites fortuitously rendered it necessary to travel over water.

Secondly, the status requirement can not be satisfied in this case by looking to the activity in which the deceased was engaged at the time of death. Van Thibodaux was not actually involved in the loading, unloading, repairing, shipbuilding or shipbreaking process, or an integral part thereof, at the time that he unfortunately met his death. We again emphasize that the uncontradicted facts indicate that the deceased was merely being transported to a job site at the time of death, as he had been transport-ed on numerous prior occasions. The deceased was not loading or unloading the vessel when it sank and the mere fact that on this one isolated occasion the vessel was to stop and a pollution pan was to be placed on a sunken barge does not operate to automatically convert the deceased into a maritime employee covered by the Act. The record does not dispute that placing the pan on the sunken barge was to be no more than a momentary and incidental diversion from the ultimate purpose to be served by the work crew boarding the vessel—transportation to the Bully Camp Field. Furthermore, there is no evidence in the record to indicate that the deceased was to participate in any way in the installation of the pollution pan. Because no conflicting inferences can be drawn under these circumstances, it can be held as a matter of law that the deceased was not engaged at the time of his death in an activity Congress sought to include within the ambit of the Act. Accordingly, the district court correctly granted summary judgment denying application of the LHWCA to this case.[11]

### 2. The Louisiana Act and General Maritime Law

The Louisiana Workmen's Compensation Act provides that any person (referred to as a "principal") who contracts out work which is a part of his "trade, business, or occupation" is liable for the payment of compensation to any of the contractor's employees who are injured while engaged in such work to the same extent as if the injured employee was an employee of the principal. LSA–R.S. 23:1061. The purpose of this section is to prevent the employer from avoiding com-

---

**9.** There is much dispute in the record concerning the significance of the intended "installation" of the pollution pan on the sunken barge. Julius Hebert, ARCO's production foreman, testified that such installation merely involved placing the pan aboard the barge and would take only minutes to complete. This testimony was uncontradicted. The plaintiffs contend that such intended installation necessarily involved the deceased in "maritime employment" within the meaning of the Act. For purposes of this appeal we assume that the parties did in fact intend to "install" the pollution pan on the barge.

**10.** *Caputo, supra*, 432 U.S. at 273, 97 S.Ct. 2348.

**11.** We therefore need not consider whether the deceased was a "borrowed employee" of ARCO.

pensation liability by contracting out all or part of his work. *Cole v. Chevron Chemical Co.*, 477 F.2d 361 (5th Cir. 1973). The trial court held that ARCO was a "principal" within the meaning of the Act, and, accordingly, the plaintiffs' exclusive remedy against ARCO is under the Louisiana Workmen's Compensation Act. LSA–R.S. 23:1032.[12]

In *Moragne v. States Marine Lines*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), the Supreme Court held that federal maritime law affords a remedy for wrongful death occasioned in state territorial waters.[13] In the case at bar ARCO seeks to utilize Louisiana law to deprive the plaintiffs of a remedy under *Moragne*.[14] We are therefore squarely presented with the issue of whether an exclusive remedy provision in a state workmen's compensation statute can operate to deprive a party of a cause of action afforded by federal maritime law.

We were presented with an analogous situation in *Roberts v. City of Plantation*, 558 F.2d 750 (5th Cir. 1977). In *Roberts* the plaintiff sought recovery under the Jones Act and general maritime law even though state proceedings under the Florida Work-

men's Compensation Act had been commenced. We succinctly held that "[i]f plaintiff can prove himself entitled to Jones Act recovery, the exclusive remedy provisions of Florida's workmen's compensation statutes cannot oust the federal court of its jurisdiction." *Id.* at 751. Our holding in *Roberts* was entirely consistent with the holding of the Supreme Court in *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953). In *Pope* the court refused to apply the Pennsylvania contributory negligence rule which would have barred all recovery in the plaintiff's general maritime personal injury action. The court stated that "[w]hile states may sometimes supplement federal maritime policies, a state may not deprive a person of any substantial admiralty rights as defined in controlling acts of Congress or by interpretative decisions of this Court. These principles have been frequently declared and we adhere to them." *Id.*, 346 U.S. at 409–410, 74 S.Ct. at 205. (footnote and citations omitted).

The holding in *Pope* was constitutionally mandated. The Constitution provides that the Judicial Power shall extend "to all cases

---

12. In the briefs and in oral argument the plaintiffs and ARCO met head on as to the issue of whether ARCO was a "principal" under the facts of this case. The parties part company as to the proper test to be applied. At the outset, we point out that we have recently certified the question of what test is to be applied in determining status as a "principal" to the final arbiter of Louisiana law—the Louisiana Supreme Court. *Blanchard v. Engine and Gas Compressor Services, Inc.*, 5 Cir., 575 F.2d at 1140. For purposes of this appeal, however, we will assume, without deciding, that the trial court was correct in classifying ARCO as a "principal" within the meaning of the Louisiana Workmen's Compensation Act.

13. *Accord, Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974).

14. ARCO does not seriously dispute that the plaintiff has properly invoked the admiralty and maritime jurisdiction of the district court. Were this issue contested, we would conclude that the plaintiffs have stated a cause of action within admiralty jurisdiction when applying the factors explicated in *Kelly v. Smith*, 485 F.2d

520 (5th Cir. 1973). In *Kelly*, we recognized that locality alone is insufficient for invocation of admiralty jurisdiction. We held that in addition to satisfying the locality test, the facts and circumstances of the claim must bear a significant relationship to traditional maritime activity. In determining whether such a significant maritime relationship exists, we held that the court should consider the following: the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and type of injury; and traditional concepts of the role of admiralty law. 485 F.2d at 525. We noted that "Admiralty has traditionally been concerned with furnishing remedies for those injured while traveling navigable waters." *Id.* at 526.

It is important to distinguish between the relationship to traditional maritime activity required for the invocation of admiralty jurisdiction, *see Kelly, supra*, and the threshold requirement of *maritime employment* necessary to establish coverage under the LHWCA. The facts of this case satisfy the former but not the latter.

of admiralty and maritime jurisdiction." This constitutional grant of jurisdiction has been construed to mean that general maritime law is to be placed under national control in " 'its substantive as well as its procedural features . . . .' " *Pope, supra*, at 409, 74 S.Ct. at 205.[15] We are mindful that there is room for state action in the regulation of maritime commerce, see, *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973), and that state created rights may be enforced in a court of admiralty. See *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 373, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). It is settled, however, that state law must yield to the needs of a uniform federal maritime system when inroads by the state cause disharmony. *Id.*

The foregoing authorities make it clear that an exclusive remedy provision in a state workmen's compensation law cannot be applied when it will conflict with maritime policy and undermine substantive rights afforded by federal maritime law. Were we to hold otherwise in this case, we would permit the State of Louisiana to erode the uniformity in federal maritime wrongful death actions spawned by *Moragne*. In creating a federal maritime action for wrongful death, the Court in *Moragne* stressed the need for uniformity. The Court stated:

> Our recognition of a right to recover for wrongful death under general maritime law will assure vindication of federal policies, removing the tensions and discrepancies that have resulted from the necessity to accommodate state remedial statutes to exclusively maritime substantive concepts. . . . Such uniformity not only will further the concerns of both of the 1920 Acts but also will give effect to the constitutionally based principle that federal admiralty law should be 'a system

of law coextensive with, and operating uniformly in, the whole country'. (citations omitted).

398 at 401–402, 90 S.Ct. at 1788. *Moragne* dictates that "[t]here is now a cause of action for wrongful death in admiralty that is not dependent on adjacent state law." *Hornsby v. Fish Meal Co.*, 431 F.2d 865, 867 (5th Cir. 1970). Our holding is limited. We deal only with the exclusive remedy provision of the Louisiana Workmen's Compensation Act as it may affect a remedy afforded by federal maritime law.

ARCO contends that if we permit the plaintiffs to proceed under general maritime tort law we will necessarily afford greater rights than would be afforded under state law merely because the deceased met his death upon navigable waters. We cannot agree. The plaintiffs are permitted to go forward with their lawsuit not merely because the deceased was killed upon navigable waters, but because the facts surrounding the occurrence display a sufficient relationship to traditional maritime activity, and because the Supreme Court in *Moragne* saw fit to provide a federal maritime remedy for wrongful death occurring upon state territorial waters regardless of the rights which might be afforded to the plaintiff under state law.

In conclusion, although the trial judge correctly determined that the LHWCA is not applicable to this case, he erroneously concluded that the Louisiana Workmen's Compensation Act provides the plaintiffs' exclusive remedy. Therefore we hereby reverse the entry of summary judgment in favor of ARCO and remand this case for such further proceedings as may be necessary to determine the rights and liabilities of the parties. On remand, the plaintiffs are entitled to pursue their general maritime claim against ARCO for wrongful

---

15. See *Bagrowski v. American Export Isbrandtsen Lines, Inc.*, 440 F.2d 502 (7th Cir. 1971), where the Court held that the exclusive remedy provision of the Wisconsin Workmen's Compensation Act could not deprive a party of the right to indemnification under federal maritime law.

death.[16] We intimate no opinion as to the merits of this claim. The trial court, of course, retains jurisdiction of the third-party indemnity claim filed by ARCO against Hughes.[17]

Affirmed in part, reversed in part, and remanded.

16. On remand, the plaintiffs are not entitled to proceed under the theory of unseaworthiness. First, ARCO did not own the vessel. Second, we have determined that the deceased was not a maritime employee entitled to the warranty of seaworthiness, but even if we had decided that the plaintiff was entitled to coverage under the LHWCA, he could not proceed under an unseaworthiness theory as a *Sieracki* seaman. *See, Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). The 1972 amendment of 33 U.S.C. § 905 eliminated the action of the covered employee based upon unseaworthiness. *Hess v. Upper Mississippi Towing Corp.*, 559 F.2d 1030, 1032 (5th Cir. 1977). Nor was the deceased a "seaman" within the traditional sense. There is insufficient evidence in the record to create a genuine issue of material fact in support of the deceased's status as a seaman. The record clearly indicates that the deceased was not permanently assigned to a vessel nor did he perform a substantial part of his work on a vessel. *See Offshore Company v. Robison*, 266 F.2d 769 (5th Cir. 1959).

We do understand the plaintiffs to allege, however, that they may proceed against ARCO because its employee Hebert negligently operated the vessel and/or negligently caused to be loaded onto the vessel an excessive amount of weight, causing the vessel to sink.

17. It is also necessary to comment upon one additional matter raised on appeal. During the course of proceedings below, and over two years after the incident in question, the plaintiffs sought to amend the complaint to add as additional defendants Julius Hebert, an ARCO employee, and Joseph Boudreaux, a Hughes employee, allegedly liable as "executive officers" under Louisiana law. The Louisiana Workmen's Compensation Act permitted such an action to be maintained at the time suit was instituted in this case.

LSA-R.S. 23:1101. The plaintiffs contend that this alternative cause of action should be considered only in the event that the Louisiana Workmen's Compensation Act is determined to be their exclusive remedy. The trial court refused to permit such amendment, apparently basing its ruling upon the conclusion that the amendment was barred by the one year prescriptive period applicable to tort actions in Louisiana. La.C.C. art. 3536.

The settlement agreement entered into between the plaintiffs and Hughes effectively absolved Boudreaux of any liability to the plaintiffs. We have determined that the plaintiffs may proceed under the general maritime law against ARCO, and, because the plaintiffs have all but conceded that they do not wish to pursue the individual claim under state law if a general maritime claim is available, we decline to rule on the propriety of the district court's refusal to permit the amendment. In any event, it appears that the plaintiffs' contention that the filing of suit against ARCO interrupted the prescriptive period as to Hebert is belied by the holding of the Louisiana Supreme Court in *Cox v. Shreveport Packing Co.*, 213 La. 53, 34 So.2d 373 (1948). In *Cox* the Court held that the filing of suit against an employee did not prevent the running of the prescriptive period as to the employer. The Court held that the employee and employer were not solidary obligors within the ambit of La.C.C. art. 2097 which provides that "A suit brought against one of the debtors in solido interrupts prescription with regard to all."