Ronald FUSCO, Petitioner,

and

Bernard Sullivan, Petitioner,

and

Director, Office of Workers' Compensation Programs, United States Department of Labor, Petitioner,

v.

PERINI NORTH RIVER ASSOCIATES, and Hartford Accident & Indemnity Company, Respondents.

Nos. 869 to 871, Dockets 79–4006, 79–4015 and 79–4016.

United States Court of Appeals, Second Circuit.

Argued April 30, 1979.

Decided June 29, 1979.

Rehearing Denied Aug. 21, 1979.

Bernard S. Epstein, Epstein & Epstein, New York City, for petitioner Ronald Fusco.

Joseph Klotz, New York City, for petitioner Bernard Sullivan.

Carin Ann Clauss, Laurie M. Streeter, Mark C. Walters, U. S. Dept. of Labor, Washington, D. C., for petitioner Director, Office of Workers' Compensation Programs.

William F. Fischer, Jr., Martin Krutzel, Fischer Brothers, New York City, for respondents Perini North River Associates and Hartford Accident and Indemnity Company.

Before GURFEIN and MESKILL, Circuit Judges, and WYZANSKI, Senior District Judge.*

* Of the District of Massachusetts, sitting by designation.

WYZANSKI, Senior District Judge:

The main question presented is whether a construction worker whose principal duties are performed on navigable waters, as that term was defined in § 3(a) of the original Longshoremen and Harbor Workers' Act, [LHWCA] 44 Stat. 1426, 33 U.S.C. § 903(a), and who sustains on such waters a work-related injury is, within the meaning of § 2(3) of LHWCA, as amended in 1972, 86 Stat. 1251, 33 U.S.C. § 902(3) (1970 ed., Supp. V) a "person engaged in maritime employment" so as to be covered by LHWCA.[1]

Fusco and Sullivan, having sustained work-related injuries in separate accidents in the course of their employment by Perini during the construction of a sewage disposal plant, called the North River Pollution Control Project, filed claims for compensation under the Longshoremen's and Harbor Workers' Compensation Act [LHWCA], as amended in 1972, 86 Stat. 1251, 33 U.S.C. § 901, (1970 ed., Supp. V) et seq.

Lesser, A.L.J. heard Fusco's case; Feldman, A.L.J. heard Sullivan's case. Each A.L.J. made findings as to the Perini project. These findings differ slightly from one another and from parallel findings by Cappo, A.L.J. in a companion case, which the BRB found most accurate. For our purposes the following two paragraphs serve as a fair summary of the findings as to Perini.

Perini is engaged in the business of heavy construction. The City of New York awarded it a contract to construct a substructure for a sewage disposal plant called the North River Pollution Control Project, to be located on the North River between 133rd and 148th Streets and to extend from the shoreline out over the water approximately 700 feet to the pierhead.

Perini's contract required it to place 2,300 hollow circular pipes, called caissons, in navigable waters down to imbedded rock, to fill the caissons with concrete, to connect them together at proper elevations above the water with concrete beams, and to place precast concrete slabs on top of the beams.

Lesser, A.L.J. found that Fusco "worked on floating stages assisting the so-called 'dock building' in the construction of the substructure, performing such tasks as fetching materials from barges or from the shore, assisting in the driving of caissons into the riverbed, pouring concrete into the caissons, fabricating wood forms for the pouring of concrete beams across the caissons and helping to construct platforms across those beams," and that "he fell while descending a ladder" and "in falling struck his head against a concrete form." The ALJ added that "one witness [whom the ALJ seems to have credited] did observe the Claimant climbing down a ladder from one of the concrete forms down to a raft below; the witness saw the ladder twist and the Claimant suddenly disappear from sight." The ALJ stated as a conclusion of law that "at the time of his injury the Claimant was employed as a construction laborer engaged in the construction of a substructure for a sewage disposal plant over navigable waters, which employment was within the coverage of the Act." The ALJ entered an order directing respondents to compensate Fusco. Respondents appealed to the Benefits Review Board [BRB].

Feldman, A.L.J. found that Sullivan "was directly involved" in "the building and filling of caissons (large cylinders sunk upright into the water) into which steel re-enforcing rods were inserted . . . and re-enforcing horizontal beams hanging over the water from caisson to caisson. . . . While working on beams at high tide, Claimant . . . would frequently be standing in water. . . . Two or three

---

1. The relevant statutory section, defining "employee," with italics indicating the material added to the original statute by 1972 amendments, 86 Stat. 1251, 33 U.S.C. § 902(3) (1970 ed., Supp. V) provides:

   "The term 'employee' *means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term* does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net."

times a week Claimant . . . went aboard barges to unload steel rods or to prepare such rods to be moved by cranes that were aboard some of the barges. . . At the time of the accident, Claimant was standing about 12 inches above the water." The ALJ's conclusions of law were "that the situs requirements for coverage under the Act have been met, Claimant having been injured while at work upon navigable waters," and that "the Employer meets the requirements of Section 2(4) of the Act in that at least some of its employees are engaged in maritime employment," but that "Claimant is not a longshoreman, ship repairman, shipbuilder, or shipbreaker. Nor could he be classified as a harbor worker," and that "nothing in Claimant's occupation . . . . entails maritime employment." The ALJ entered an order rejecting the claim. Sullivan appealed to the BRB.

The BRB heard in one proceeding *Fusco, Sullivan,* and two other cases, and permitted the Director, Office of Workers' Compensation Programs, United States Department of Labor, to become a party in interest. By its November 30, 1978 order, the BRB reversed Lesser, A.L.J. in *Fusco* and affirm Feldman, A.L.J. in *Sullivan.* Writing for himself and Member Kalaris, over the dissent of Member Miller, Chairman Smith of the BRB,[2] after noting that "Claimants were found in each case to have satisfied the Section 3(a) situs test . . [and that] [t]he findings of situs are not on appeal," held that "Since the claimants herein were engaged in the construction of a sewage disposal plant, their employment did not have a realistically significant relationship to maritime activities involving navigation and commerce over navigable waters. It follows that the claimants were not engaged in maritime employment pursuant to Section 2(3) and thus are not covered under the act."

Fusco, Sullivan, and the Director, relying upon 33 U.S.C. § 921(c), petitioned this Court to set aside the BRB November 30, 1978 order.

The petitions before us raise only one question, the so-called status issue—whether the claimant at the time of his injury was a "person engaged in maritime employment," as that phrase is used in § 2(3) of the LHWCA, 86 Stat. 1251, 33 U.S.C. § 902(3) (1970 ed., Supp. V). Respondents contend that we must also consider the so-called situs issue—whether the injuries occurred on navigable waters.

In *Sullivan,* where respondents succeeded before both the ALJ and the BRB, the respondents are entitled to contend that if they do not prevail before us on the status issue they are entitled to prevail on the situs issue. But in *Fusco* we need not consider respondents' contention because when respondents appealed from the ALJ to the BRB they abandoned the situs issue by their failure to assign it as error. (App. 31, note 2). Yet one of the arguments addressed to us by petitioners with respect to the status issue—to wit, that under the 1927 Act before it was amended in 1972 petitioners would have been entitled to compensation for the injuries of which they complain—makes it appropriate for us, before we tackle the status issue, to scrutinize the administrative findings not merely in *Sullivan* but also in *Fusco* in order to determine whether the injuries occurred upon navigable waters as that term was used in the original 1927 LHWCA and as it is now used under the 1972 amendments.

■ In our scrutiny we need to bear in mind that under the 1927 LHWCA, before its amendment, there was coverage only for "an injury occurring upon the navigable waters of the United States." 44 Stat. 1426, 33 U.S.C. § 903(a). Since the term "navigable waters" was then read literally and did not include extensions of land, there was no coverage of an injury occurring on a structure permanently affixed to land. *Nacirema Operating Co. v. Johnson,* 396 U.S. 212, 214–215, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969). It was only after the 1972 amendments that the term navigable waters of the United States was defined to include "any adjoining pier, wharf, dry

2. The BRB opinions are reported at 9 BRBS 378.

dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel." 86 Stat. 1251, 33 U.S.C. § 903(a) (1970 ed., Supp. V).

■ In *Fusco* the injury occurred as the claimant descended a swinging ladder from a concrete form to a raft, and the ladder twisted and threw him against the form, causing him to fall, perhaps but not certainly, into the water. Respondents contend that this was an injury occurring *on* a structure permanently affixed to land, and so was not within the coverage of the original 1927 Act. We conclude that respondents are mistaken. Fusco was injured over navigable waters while on a rope ladder temporarily affixed to a structure which may or may not have been permanently affixed to land. He was hit by the structure not while on it, but while on the ladder. Under both the 1927 LHWCA and the 1972 amendments Fusco's injury occurred "upon navigable waters."

■ In *Sullivan* the injury occurred while the claimant "was installing beams about 150 feet from the shore and was standing about 12 inches above the water." The ALJ does not tell us upon what he was standing. But from the ALJ's findings and the BRB's opinion we know that the part of Perini's construction work in which Sullivan was involved called for connecting embedded or sunken caissons at proper elevations above the water with concrete beams. We therefore cannot suppose that at the time of the accident, while installing beams hanging over water, Sullivan was standing on a structure permanently affixed to land.

We conclude that Sullivan's injury occurred "upon navigable waters" as that term was used in 1927 as well as in 1972.

The foregoing analysis disposes of respondents' contention that, regardless of how we decide the status issue, they are entitled on the basis of the situs issue to have the November 30, 1978 BRB order affirmed.

We now turn to the main question presented in each of the two cases before us—whether at the time of his injury the claimant was a "person engaged in maritime employment" as that phrase is used in § 2(3) of the amended LHWCA 86 Stat. 1251, 33 U.S.C. § 902(3) (1970 ed., Supp. V).

The phrase "[a] person engaged in maritime employment" (hereinafter sometimes called "the critical phrase") is not defined in the 1972 Amendments nor in the 1927 LHWCA which was being amended.

Etymologically, the critical phrase could have an occupational, or a geographical connotation, or both: that is, it could refer to a person engaged in an occupation characteristically associated with the sea or other navigable waters, and/or to a person engaged in work upon the sea or other navigable waters.[3]

The BRB in the instant case gave to the critical phrase an occupational interpretation,[4] modeled on, but somewhat different from, the interpretation given by the Ninth Circuit[5] in *Weyerhaeuser Company v. Gilmore*, 528 F.2d 957, 961 (9th Cir.), *cert. denied*, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976). Petitioners contend that the appropriate interpretation is geographical. Respondents support an occupational interpretation.

---

**3.** See 1A Benedict on Admiralty, (7th ed. 1973) § 17: "On the basis that there can be nothing more maritime than the sea, every employment on the sea or other navigable waters should be considered as maritime employment."

**4.** The BRB concluded "that a claimant's employment must have a realistically significant relationship to maritime activities involving navigation and commerce over navigable waters in order for that employment to be deemed maritime employment under Section 2(3)."

**5.** *Weyerhaeuser Company v. Gilmore, supra,* held:

> [T]hat for an injured employee to be eligible for federal compensation under LHCA, his own work and employment, as distinguished from his employer's diversified operations, including maritime, must have a realistically significant relationship to 'traditional maritime activity involving navigation and commerce on navigable waters,' with the further condition that the injury producing the disability occurred on navigable waters or adjoining areas as defined in § 903.

The strongest argument for an occupational interpretation rests on a portion of the bare text of the statute. The critical phrase is immediately followed by the words "including any longshoreman or other person engaged in longshoring operations, and any harborworker, including a ship repairman, shipbuilder and shipbreaker." The word "including" does not necessarily determine that the critical phrase refers to a class of which the following specifically described persons are members.[6] But it is noteworthy that, with the possible exception of harborworkers, each of the persons specifically described is described occupationally not geographically. The *noscitur a sociis* and *ejusdem generis* canons of construction suggest that the critical phrase is used occupationally and as a description of a class of persons in terms of their occupation.

■ Yet that argument fails to give any weight to another argument also based on the bare text of the statute. The critical phrase is so nearly identical with the phrase "employees . . . employed in maritime employment" which appears in § 2(4) (quoted in footnote 7) of the very statute which was being amended that it seems to have been adapted, if not adopted, from § 2(4). This invokes a different rule of statutory construction: when a legislature borrows an already judicially interpreted phrase from an old statute to use it in a new statute, it is presumed that the legislature intends to adopt not merely the old phrase but the judicial construction of that phrase. *Burnet v. Harmel,* 287 U.S. 103, 108, 53 S.Ct. 74, 77 L.Ed. 199 (1932).

In view of the ambiguity of the text of the 1972 Amendments, we find it necessary for an understanding of the critical phrase to turn to the legislative and judicial history of the original 1927 LHWCA as well as the legislative history of the 1972 amendments, especially since, as we have recently been reminded, the LHWCA "must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." *Voris v. Eikel,* 346 U.S. 328, 333, 74 S.Ct. 88, 92, 98 L.Ed. 5 (1953) quoted in *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 268, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977).

Congress enacted the original 1927 LHWCA in response to *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), *Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920), and *Washington v. W. C. Dawson & Co.,* 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924), which held that the States were without power, and Congress could not delegate to them power, to provide compensation for longshoremen injured on navigable waters. Mr. Justice Brennan, writing for the majority of the Supreme Court, in *Calbeck v. Travelers Insurance Co.,* 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962) read the legislative history as showing that it was the Congressional purpose to enact "a statute which would provide federal compensation for all injuries to employees on navigable waters; in every case, that is, where *Jensen* might have seemed to preclude state compensation." (*Ibid.,* pp. 120–121, 82 S.Ct. 1200). He rejected the narrower reading by Mr. Justice Stewart, who regarded the Congressional purpose as merely "to provide a compensation remedy for those who could not obtain such relief under state law." *Ibid.,* p. 134, 82 S.Ct. 1207:

In carrying out its purpose, Congress proceeded by adopting special definitions of injury, employee, and employer [7] and defin-

---

**6.** Thus, for example, the words "human beings" are descriptive of a class when used in the phrase "human beings, including men and women," but are not descriptive of a class when used in the phrase "human beings, including cats and dogs."

**7.** " 'Injury,' 'employee,' and 'employer' were defined in 33 U.S.C. §§ 902(2), (3), (4):

"(2) The term 'injury' means accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury . . . .
(3) The term 'employee' does not include a master or member of a crew of any vessel, nor any person engaged by the master to

ing coverage.[8] The consequence of those definitions was that so long as a work-related injury occurred on navigable waters and the injured worker was not a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net, the worker would be eligible for federal compensation provided that his employer had at least one employee (who might be the claimant himself) "employed in maritime employment in whole or in part."[9] The 1927 statute gave no guidance as to the meaning of the phrase just quoted, which appeared in the definition of "employer."

For decades the Supreme Court and inferior federal courts struggled to interpret the eligibility provisions of the 1927 LHWCA. In *Parker v. Motor Boat Sales, Inc.,* 314 U.S. 244, 62 S.Ct. 221, 86 L.Ed. 184 (1941) the Supreme Court upheld a finding of a Deputy Commissioner that a janitor whose only maritime activity was one trip as a lookout on a boat was "engaged in maritime employment" so as to make his employer subject to the LHWCA. In *Davis v. Department of Labor and Industries,* 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246 (1942) all of the members of the Supreme Court agreed that federal coverage under LHWCA would have been available for a structural steel construction worker who worked over navigable waters, but whose duties were exclusively related to construction of a bridge. In *Pennsylvania Railroad Co. v. O'Rourke,* 344 U.S. 334, 73 S.Ct. 302, 97 L.Ed. 367 (1953) it was held that a railroad worker injured on navigable waters was covered by the LHWCA. Finally, *Calbeck v. Travelers Insurance Company, supra,* in 1962 conclusively settled that any employee, no matter what his calling, who was injured while at work on navigable waters was [in maritime employment] covered by the LHWCA.

We doubt that Supreme Court ever said *in haec verba* that any person employed upon navigable waters is, for purposes of § 2(4) of LHWCA, 33 U.S.C. § 902(4), "employed in maritime employment;" but that is the only principled explanation of many of the cited Supreme Court cases, especially *Davis v. Department of Labor and Industries,* and of many lower federal court cases, including cases involving construction workers.[10]

We now come to the legislative history of the 1972 Amendments.

As is shown by the complete text of the 1972 Amendments, 86 Stat. 1251–1265, and by the virtually identical Senate and House reports—S.Rep.No.92–1125, 92 Cong. 2 Sess. (1972) and H.R.Rep.No.92–1441, U.S.Code Cong. & Admin.News 1972, p. 4698 (of which relevant portions are printed in the margin),[11] the main concerns of Congress

load or unload or repair any small vessel under eighteen tons net.
(4) The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any dry dock)."

**8.** "Title 33 U.S.C. § 903 defined the coverage provided by the Act:
"(a) Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law. . . ."

**9.** See Marshall, J., in *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 264, 97 S.Ct. 2348, 2354 fn. 13, 14, 53 L.Ed.2d 320 (1977).

**10.** *Peter v. Arrien,* 325 F.Supp. 1361, 1365 (E.D. Pa.1971) aff'd, 463 F.2d 252 (3rd Cir. 1972); *Hardaway Contracting Co. v. O'Keeffe,* 414 F.2d 657 (5th Cir. 1968); *DeBardeleben Coal Corp. v. Henderson,* 142 F.2d 481, 482, note 3 (5th Cir. 1944); *Travelers Ins. Co. v. Branham,* 136 F.2d 873, 875 (4th Cir. 1943).

**11.** [I]n the section describing the shoreward extension, the Committee Reports state:
"The Committee believes that the compensation payable to a longshoreman or a ship repairman or builder should not depend on the fortuitous circumstance of whether the injury occurred on land or over water. Accordingly, the bill would amend the Act to provide coverage of *longshoremen, harbor workers, ship repairmen, ship builders, shipbreakers, and other employees engaged in maritime employment* (excluding masters and members of the crew of a vessel) if the

were unrelated to "coverage." See *Northeast Marine Terminal Co. v. Caputo, supra,* 432 U.S. pp. 261–262, 97 S.Ct. 2348. Indeed, that topic occupied only half a page of a 15-page set of amendments.

When Congress did deal with coverage, it did not undertake a general study of the subject. Congress did not address itself to the problems raised in *Parker, Davis, Pennsylvania Railroad, Calbeck,* or cognate lower federal court cases, nor did Congress comment upon the *Calbeck* doctrine that it was the Congressional purpose to give a federal compensation remedy to all workers, except crew members, injured seaward of the *Jensen* line. *Congress took it for granted that injuries occurring upon water were covered and would remain covered. There was no indication that Congress considered withdrawing existing coverage or eligibility.* What concerned Congress was injuries on land.

The original Act had not provided compensation to anyone on land. *Nacirema*

*Operating Co. v. Johnson, supra.* This often seemed inequitable, especially in the case of longshoremen who moved back and forth from vessel to dock [12] or who worked stripping and stuffing containers at terminals, as has become common as a result of modern technology.[13] So Congress decided to extend the coverage shoreward for the benefit of "longshoremen, harbor workers, ship repairmen, shipbuilders, shipbreakers, and other employees engaged in maritime employment," but Congress did not want to include persons "just because they are injured in an area adjoining navigable waters." [14]

To give longshoremen, harborworkers, any person engaged in maritime employment the benefit of coverage while they were on areas adjoining navigable waters, Congress broadened the definition of "navigable waters" of the United States to include "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or

injury occurred either upon the navigable waters of the United States or any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other area adjoining such navigable waters customarily used by an employer in loading, unloading, repairing, or building a vessel." S.Rep.13; H.R.Rep.10. [Emphasis added].

"The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity. To take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, *just because they are injured in an area* adjoining navigable waters used for such activity. Thus employees whose responsibility is only to pick up stored cargo for further trans-shipment would not be covered, *nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo.* However, checkers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment. *Likewise the Committee*

*has no intention of extending coverage under the Act to individuals who are not employed by a person who is an employer, i. e., a person at least some of whose employees are engaged, in whole or in part in some form of maritime employment.* Thus, an individual employed by a person none of whose employees work, in whole or in part, on navigable waters, is not covered even if injured on a pier adjoining navigable waters." S.Rep.13; H.R.Rep.10–11. [Emphasis added].

"Section 2(a) amends section 2(3) of the Act to define an 'employee' as any person engaged in maritime employment. The definition specifically includes any longshoreman or other person engaged in longshoreing [sic] operations, and any harborworker, including a ship repairman, shipbuilder and shipbreaker. It does not exclude *other employees traditionally covered* but retains that part of 2(3) which excludes from the definition of 'employee' masters, crew members or persons engaged by the master to unload, load or repair vessels of less than eighteen tons net." S.Rep.16. See also, H.R.Rep.14. [Emphasis added].

**12.** See *Northeast Marine Terminal Co. v. Caputo, Ibid.,* 432 U.S. pp. 259–260, 269, 97 S.Ct. 2348.

**13.** *Ibid.,* p. 269.

**14.** See footnote 11.

other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel." [15]

To make sure that on that new situs eligibility would not extend to a person who had no relation to maritime employment except that his employer had at least one employee employed in maritime employment, Congress amended the definition of "employee."

Explaining the amendment to the definition of "employee" in § 2(3), the Congressional Committees stated:

The definition specifically includes any longshoreman or other person engaged in longshoreing [sic] operations, and any harborworker, including a ship repairman, shipbuilder and shipbreaker. It does not exclude other employees traditionally covered. . . .

In the phrase "other employees traditionally covered" the word "covered" deserves emphasis. Of course it is only the LHWCA's coverage which would be relevant. "Traditionally covered," therefore, means employees previously covered by the LHWCA. The phrase does not mean traditionally employed in navigation or maritime commerce. In fact, most employees engaged in navigation or maritime commerce are crew members who are excluded by § 2(3) of the LHWCA and are traditionally covered by the Jones Act, 46 U.S.C. § 688, et seq.

There is another significant indication that Congress intended that a person who, before 1972, had eligibility because his principal duties were on navigable waters as then defined should retain his eligibility. In the Committee Reports there is a discussion of the effect of the 1927 definition of an "employer," which appears in § 2(4) of the 1927 Act, 49 Stat. 1426. Interestingly, the Committee misquotes § 2(4) both by changing "employed" to "engaged," and by

mislocating the phrase "in whole or in part." The correct text of the 1927 version of § 2(4) reads:

The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any dry dock).

The 1972 Congressional Committee's description of the term "employer" reads:

[A] person at least some of whose employees are engaged, in whole or in part, in some form of maritime employment.

If we reflect on this misquotation and then look at the introductory phrase in the 1972 definition of employee, "any person engaged in maritime employment," it does not take a Sherlock Holmes to infer that whoever drafted the 1972 definition of "employee" borrowed the just-quoted part of it from his reading of the 1927 definition of "employer." In the light of the judicial gloss on the 1927 definition of "employer" there is a presumption that the draftsman intended that the 1972 definition of employees should cover at least any person whose principal employment was upon water.

We now turn from the legislative history to a review of factors not emphasized by Congress but in our view relevant to the question presented to us.

1. The Supreme Court has given far more than lip service to its oft-repeated statement that LHWCA and the amendments thereto are remedial acts which are to be liberally interpreted to benefit employees and avoid harsh results. The Court has not hesitated even to read out of the LHWCA an explicit statutory provision (to wit, that part of § 3(a) of the 1927 LHWCA, former 33 U.S.C. § 903(a) which provided that compensation shall be paid for injuries occurring on navigable waters only "if recovery . . . through workmen's com-

---

**15.** 33 U.S.C. § 903(a) (1970 ed., Supp. V) provides:

"Compensation shall be payable . . . in respect of disability or death of an employee but only if the disability or death results from an injury occurring upon the navigable waters of the United States *(including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)* . . . ." [The italicized parts indicate material added in 1972].

pensation proceedings may not validly be provided by State law"), where the Court found it repugnant to the general purpose of Congress to protect persons injured seaward of the *Jensen* line. *Calbeck v. Travelers Ins. Co., supra.*

2. *A petitio principii* is built into the frequently-repeated statement that before 1972 the right to recover under the LHWCA was based primarily on the situs of the injury and that the 1972 amendments changed the basis of recovery to make it dependent both on a status test and a situs test. The Congressional Committees never used the words "situs" and "status" although those words must have been known to Congress since they were used in *Nacirema Operating Co. v. Johnson, supra,* 396 U.S. at 215, 90 S.Ct. 347, which was one of the cases which triggered the 1972 Amendments. We ought not to assume that just because Congress moved into a two-pronged situation with respect to injuries over land, it also moved into a two-pronged situation with respect to injuries over water, especially when there is no evidence of such an intention except possibly in one tangential situation. The possible exception relates to a person whose principal duties are on land and who sustains a work-related injury on navigable waters. Under the pre-1972 LHWCA a land-based worker injured on a single trip over water could recover. *Parker v. Motor Boat Sales, Inc., supra.* When Congress amended § 2(3) it borrowed from the § 2(4) text but omitted the words "in whole or in part," and thus Congress may have established as a test of status the question whether the injured person had his major activities upon navigable waters. Cf. *Thibodaux v. Atlantic Richfield Co.,* 580 F.2d 841 (5th Cir. 1978), cert. denied, —— U.S. ——, 99 S.Ct. 2820, 60 L.Ed.2d 274 (1979).

3. Unless the term a "person engaged in maritime employment" be read geographically to include a person who while at work on navigable waters suffers a work-related injury, some persons employed on navigable waters will be left without any compensation remedy, state or federal. We have no data showing how large this group is in a period of increased exploration, excavation, drilling, and other enterprise on navigable waters. Moreover, even, if there is protection under state law, Congress might regard it as inadequate. In 1972 Congress demonstrated that it did not want to leave persons injured on navigable waters to the often low scale of state benefits: it removed the restriction which, in the 1927 Act, had made federal compensation payable "only . . . if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law." [16]

4. Any occupational interpretation such as that proposed by the BRB—"a claimant's employment must have a realistically significant relationship to maritime activities involving navigation and commerce over navigable waters in order to be deemed maritime employment under Section 2(3)"— runs into great difficulty. Obviously. it does not apply to a member of a crew, because § 2(3) itself excludes him. If it were to be applied to all other significant relationships to navigation and commerce this would do violence to the statement in the Congressional Reports that there would not be LHWCA coverage as a result of the amendments for "purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo." In short, it seems as though an occupational definition of the critical phrase would be a perversion of Congressional purpose unless it is limited to the specific categories of longshoremen, harborworkers and so forth. And if so limited it is duplicitous and superfluous.

5. The geographical interpretation avoids the anomaly of different readings of substantially the same phrase in two adjacent sub-sections, § 2(3) and § 2(4) of the same Act. Were different interpretations

---

**16.** See *Northeast Marine Terminal Co. v. Caputo, supra,* 432 U.S. page 263, n. 21, 97 S.Ct. 2348; see historical note to 33 U.S.C.A. § 903.

to be prescribed, there would be sure to follow considerable confusion of claimants, their counsel, administrators, and judges. The importance of identical interpretations is illustrated by a case we are deciding today. See *Tantzen, et al. v. Shaughnessy,* 601 F.2d 670, 2nd Cir., 1979.

6. The geographical interpretation gives administrative agencies and courts the benefit of a vast body of previous judicial interpretations of the phrase "employed in maritime employment."

7. A geographical test, as experience shows, rests upon a simple standard which will minimize litigation and increase efficiency without any apparent social disadvantage. See 4 Larson, Workmen's Compensation Law (1979), § 89.27, at pp. 16–178; Gilmore & Black, The Law of Admiralty (2nd ed. 1975) pp. 428–430.

8. Despite what is said in *Weyerhaeuser Company v. Gilmore,* at p. 961, col. 1, the geographical interpretation of "maritime employment" will not make superfluous the critical phrase in § 2(3), 33 U.S.C. § 902(3) and will not leave the Act with no status test whatsoever. Under such an interpretation, the 1972 Amendment will still operate, as Congress intended, to preclude compensation being paid to a land-based employee whose only claim to coverage is that he, while working for an employer who had an employee engaged in maritime employment, was injured on land in an area adjoining navigable waters. See Larson, *supra,* § 89.27, pp. 16–182.

9. Even if under a geographical interpretation of the 1972 Amendment an employer like Perini finds that on the same construction project some of its construction employees are under federal compensation law, some are under state compensation law, and some alternating according to their work assignments, this lack of uniformity may be justified by genuine differ-

ences (not experienced, for example, by longshoremen) between the risk of maritime employment and the risk of land-based employment. Moreover, if uniformity is desirable that is a question for Congress, not for us. So far, Congress has sought uniformity only by assuring longshoremen and harborworkers that they will be as highly compensated for injuries sustained ashore as on navigable waters. It would be another story for us, undirected by Congress, to hold that construction workers injured on navigable waters are, for the sake of uniformity, to be limited to the compensation that they or other construction workers would receive for injuries on land-based jobs.

■ Weighing all relevant factors, we interpret the critical phrase "person engaged in maritime employment" geographically so as to include any person whose principal duties are performed on navigable waters as that term was understood before 1972. In this case we have no occasion to decide whether the critical phrase also includes a person whose principal duties are on land but who suffers work-related injuries while performing duties upon navigable waters.[17]

Our conclusion is consistent with the purposes of the Congress—to extend and not to withdraw eligibility—and avoids the harsh results which would flow from a strictly occupational interpretation.

■ Since each claimant—that is, Fusco and Sullivan—performed his principal duties upon navigable waters as that term was defined in § 3(a) of the original 1927 LHWCA, 44 Stat. 1426, 33 U.S.C. § 903(a), and sustained on such waters a work-related injury, we hold that each was eligible for compensation as "[a] person engaged in maritime employment" within the meaning of § 2(3) of the LHWCA as amended in 1972, 86 Stat. 1251, 33 U.S.C. § 902(3) (1970 ed., Supp. V).

---

**17.** In this case it is unnecessary for us to decide the eligibility of a person who performed merely incidental duties on navigable waters. Cf. *Thibodaux v. Atlantic Richfield Co., supra,* holding that the amended LHWCA does not apply to an employee who performs his duties on land but is injured during his transportation over navigable waters while journeying from one land duty to another land duty.

There remains for us to consider the respondents' motion to dismiss the Director's petition on the ground that he lacks standing to petition for review of the BRB's November 30, 1978 order.

■ We hold that the Director was not "adversely affected or aggrieved" by the Board's November 30, 1978 order denying Fusco's and Sullivan's claims to compensation. Therefore, he lacks statutory standing to petition for review pursuant to 33 U.S.C. § 921(c). *Director, Office of Workers' Compensation Programs v. Donzi Marine, Inc.,* 586 F.2d 377 (5th Cir. 1978). *I. T. O. Corporation of Baltimore v. Benefits R. Bd.,* 542 F.2d 903 (4th Cir. 1976), *vacated sub nom. Adkins v. I. T. O. Corp. of Baltimore,* 433 U.S. 904, 97 S.Ct. 2967, 53 L.Ed.2d 1088 *rev'd on remand on other grounds,* 563 F.2d 646 (1977). We cannot improve upon what seem to us the irrefutable analyses of Judges Ainsworth and Winter, for the Fifth and Fourth Circuits, respectively. If our earlier opinion in *Pittston etc.* [*Pittston Stevedoring Corp. v. Dellaventura* 544 F.2d 35 (1976)] looks the other way, it is not controlling because we simply found it unnecessary there to decide the standing of the Solicitor of Labor to move to dismiss an appeal by an employer as untimely, 544 F.2d at 42. In any event we do not suggest in *Pittston* that the Solicitor or the Director could seek independent review to attempt to *reverse* the BRB.

We need not decide whether the Director lacks constitutional standing under U. S. Constitution Article III on the ground that he does not present what is in his situation a "case or controversy."

*Petitions of Fusco and Sullivan granted. The BRB's November 30, 1978 order is set aside and the case is remanded for further proceedings not inconsistent with this opinion.*

*Petition of the Director dismissed for lack of statutory standing.*

## OPINION ON RESPONDENTS' PETITION FOR REHEARING

Contrary to what is alleged at page 10 of respondents' petition for rehearing, the record does not show that Sullivan when injured was standing upon a substructure extending from the shoreline. It is true that one of the examining counsel's questions assumed that Sullivan was "on this substructure." But Sullivan never said or implied that he was standing on that substructure. He testified that he was "located right above the water." The fair implication is that he was on a temporary platform above the water and the substructure was under the water. Thus there was substantial evidence for the ALJ to conclude that Sullivan "was standing about 12 inches above the water" and was "injured while at work upon navigable waters."

*Petition for rehearing denied.*