Ruth MILLER, Petitioner,

v.

CENTRAL DISPATCH, INC. and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.

No. 80-2135.

United States Court of Appeals, Fifth Circuit.*
Unit A

April 22, 1982.

* Former Fifth Circuit case, Section 9(1) of Public   Law 96-452—October 14, 1980.

Atreus M. Clay, Houston, Tex., for petitioner.

Mark C. Walters, Joshua Gillelan, U. S. Dept. of Labor, Washington, D. C., for Director, Office of Workers' Compensation Programs, U. S. Dept. of Labor.

Harold Eisenman, Houston, Tex., for Central Dispatch, Inc.

Before BROWN and GOLDBERG, Circuit Judges.**

JOHN R. BROWN, Circuit Judge:

Claimant Ruth Miller appeals from a decision of the Benefits Review Board (BRB) denying coverage under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et seq.* The BRB determined that Ms. Miller was not within the scope of the Act and reversed the decision of the administrative law judge (ALJ) who had awarded Ms. Miller benefits for temporary disability. Finding that the BRB erred in its determination that Ms. Miller was not "engaged in maritime employment" within the meaning of Section 2(3) of the Act, 33 U.S.C. § 902(3), we reverse and remand.

### Miller Dispatched

Claimant Ruth Miller began working for Central Dispatch, Inc., (Central) in March of 1976. For the first three or four months of her employment, Miller guarded detainees (foreign seamen who are barred from entering the United States) aboard ship. After that time, Miller became a driver, transporting men and "cargo" [1] to and from various points on shore. In this capacity, Miller drove ill seamen from vessels to the hospital, took payrolls aboard ships, transported crew members and detainees to and from the airport, and transported cargo between vessels and shore. As part of her duties, Miller went aboard vessels an average of five or six times a day. Approximately 95% of Miller's time was spent driving in and around Houston.

Employer Central is basically a specialized maritime service agency with offices in Houston, Beaumont, and Galveston, Texas and New Orleans. The manager of the Houston office stated that its actual business is the transportation of seamen and cargo between vessels and various points on shore, "just like a taxi service." Central also provides security services, including guarding gangplanks, entire ships, or detainees.

On December 3, 1976, Miller was allegedly injured as a result of exposure to noxious fumes aboard the *STOLT RHINO* in the

** Due to his death on December 22, 1981, Judge Ainsworth did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. 46(d).

1. The parties specifically use the term "cargo" in describing Ms. Miller's activities.

Port of Houston. Miller had picked up at the Houston Intercontinental Airport a South African seaman being detained by immigration officials. She transported him to the *STOLT RHINO* and boarded the vessel to deliver the detainee to the ship's captain. Miller's duties with Central required that she remain with the seaman aboard ship until the captain determined whether or not to accept the detainee. Should the captain refuse to accept the detainee, Miller would have to return the man to immigration officials. The captain questioned the detainee for about 40 minutes before accepting him. It was during these 40 minutes aboard ship that Miller was exposed to noxious fumes or gases which caused her injury, diagnosed as allergic dermatitis. She noticed a strong odor and her eyes began to water. The captain told her that he had a load of "bad gas" aboard which he was not permitted to unload. Once the seaman was accepted by the captain, Miller returned to the offices of Central.

She continued working but as the evening progressed, Miller began itching all over, had difficulty seeing, and experienced swelling in her legs. Around midnight, when Miller's supervisor returned to Central's office and observed Miller's condition, he suggested that she leave the office and go to the hospital. She was treated in the emergency room and was admitted to the hospital for four days. Miller returned to work for a day, but suffered a recurrence of her symptoms and was hospitalized again for two weeks for "nausea, tightness in her throat, fainting spells and allergic dermatitis." On December 20, 1976, Miller returned to driving for Central and, although she was not feeling well, continued to work until January 3, 1977, the date she was fired due to a "personality clash" with the manager. Her symptoms returned and she was hospitalized a third time, for two weeks beginning January 6, 1977 "due to decompensation of the depressive state she was

exhibiting previously."[2] In February 1977, Miller was again hospitalized for treatment of a persistent rash. At this time, however, the hospital officials discovered that Miller was no longer working for Central and she was discharged from the hospital because she was otherwise uninsured. Miller was unable to work again until September 1977.

### The ALJ's Determination

Miller filed a claim for benefits under the LHWCA. A hearing was held on May 15, 1978 before an ALJ. The ALJ found that Miller sustained an injury resulting in temporary total disability from December 3, 1976 to September 15, 1977 and a 50% temporary partial disability from September 16, 1977 and continuing. The ALJ concluded that Miller's injury, sustained aboard the *STOLT RHINO*, was within the coverage of the LHWCA. Based upon Miller's testimony as to her specific duties on the day of the injury and Central's testimony as to the nature and character of her services, the ALJ found that while Miller was not a longshoreman or harbor worker, she was "nevertheless engaged in maritime employment because she was injured over navigable waters as defined prior to 1972, and the nature and character of the work being performed is an important if not a necessary service to the shipping industry."

█ The ALJ's opinion also detailed the extent and duration of Miller's disability and the evidence supporting the finding. The ALJ determined that while Miller was advised by her attending physician on or about September 15, 1977 to "try to return to work" she was not rehired. Although she sought other employment, this employment was intermittent and less remunerative. The ALJ specifically found that Miller could do certain light work but that the employer had failed to establish that Miller had actual opportunities to obtain other work.[3] Based on Miller's earnings at the

---

**2.** Her attending physician reported on May 17, 1977 that: "It is my belief that the undue stress caused by the patient's exposure to the chemical and subsequent hospitalization was suffi-

cient to decompensate the patient to the point of her present symptomatology."

**3.** The ALJ stated:

time of her injury and those following the injury, the ALJ determined that Miller had suffered a 50% temporary partial disability and ordered Central to pay benefits, medical expenses, and attorneys' fees.

### The View from the Board

Both Miller and Central appealed the ALJ's decision to the Benefits Review Board[4] pursuant to § 21(b) of the LHWCA.[5] Central's challenge to the ALJ's opinion is twofold: (1) Miller was not engaged in maritime employment as required by § 2(3) of the Act, 33 U.S.C. § 902(3), and thus there was no coverage; and (2) the decision below was not supported by substantial evidence. Miller's appeal contests the ALJ's denial of additional compensation pursuant to § 14(e) and § 14(f), 33 U.S.C. § 914(e), (f).[6] The BRB, one member dissenting, held that Miller was not engaged in maritime employment pursuant to § 2(3)

and thus was not covered under the Act. The BRB began by stating that employment or injury over actual navigable waters is not dispositive in ascertaining maritime employment under the Act. Finding that Miller was not included in any of the specific occupations mentioned in § 2(3) (longshoreman, ship repairman, ship builder, or harbor worker), the BRB focused on whether Miller was engaged in some form of "maritime employment," as that term is defined by the BRB. The BRB's definition provides: "[A] claimant's employment must have a realistically significant relationship to maritime activities involving navigation and commerce over navigable waters in order for that employment to be deemed maritime employment under Section 2(3)." *Sedmak v. Perini North River Associates,* 9 BRBS 378, 386 (1978), *rev'd sub nom., Fusco v. Perini North River Associates (Fusco I),* 601 F.2d 659 (2d Cir. 1979), *vacated and remanded,* 444 U.S. 1028, 100 S.Ct. 697, 62

---

The burden is on the employer to establish that an employee injured in the course of her employment who proves she is disabled from her regular employment has actual opportunities to obtain other work.... Employer not only refused to rehire Claimant, it failed to assist in finding other employment. Such employment must be within Claimant's capacity to perform and available to her. Showing this is a burden of Employer....

Although the parties have not raised the issue of degree of disability, because of our disposition of this case which requires a remand, we wish to emphasize that this Court, while placing the burden on the employer to show job availability, does not require the employer either to rehire a claimant or to assist him in finding other employment. *See New Orleans (Gulfwide) Stevedores v. Turner,* 661 F.2d 1031 (5th Cir. 1981) (defining the nature of the burden of establishing job availability).

4. Under the LHWCA, primary responsibility for findings of facts and determining validity of a claim is placed on the ALJ. An appeal of the ALJ's decision may be brought to the BRB. 33 U.S.C. § 921. The scope of review by the BRB is limited and does not consist of making independent findings of fact. "The findings of fact and the decision under review by the Board shall be conclusive if supported by substantial evidence and the record considered as a whole." 33 U.S.C. § 921(b)(3).

5. Subsequent to its appeal of the July 10, 1978 decision of the ALJ, the employer sought further relief pursuant to § 22 of the LHWCA, 33

U.S.C. § 922, on the ground that changed conditions mandated modification of the initial award. The deputy commissioner denied the request for modification and Central obtained a formal hearing before the ALJ. The ALJ determined that, while the evidence presented by Central did not warrant modification of the original award, the ALJ lacked authority either to grant or deny the petition for modification since the award was not a "final order" within the meaning of § 21(a). The ALJ concluded that § 22 does not supersede the appellate process in § 21(b). Before the BRB, the Director sought reversal of the ALJ's decision finding § 22 inoperable because the order sought to be modified had not become final. Central appealed contending that the ALJ erred in holding that he did not have jurisdiction to hear the § 22 modification request and that there was substantial evidence to support his allegation of a change in condition. The BRB, in its opinion, determined that since there was no jurisdiction under the LHWCA for Miller's claim, the issue of modification under § 22 was moot. Because of our disposition of this case, we leave this issue to the BRB to determine upon remand.

6. Since the BRB determined that Miller was not covered under the Act, it did not reach her appeal for additional compensation. Upon remand, her appeal, as well as Central's challenge to the evidence supporting the decision of the ALJ, must be considered.

L.Ed.2d 664, *Board's decision aff'd on remand* (*Fusco II*), 622 F.2d 1111 (2d Cir. 1980), *cert. denied*, 449 U.S. 1131, 101 S.Ct. 953, 67 L.Ed.2d 119 (1981); *Churchill v. Perini North River Associates*, 652 F.2d 255 (2d Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 1425, 71 L.Ed.2d 647 (1982) (considering effect of *Sun Ship, Inc. v. Pennsylvania*, 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980) on *Fusco II*).[7]

Applying its own definition to the facts, the BRB proceeded to dissect the occupational aspects of Miller's job, finding that her work as a guard was not within the Act. To support this conclusion, the BRB relied exclusively· on three of its prior decisions, all of which denied coverage to guards and all of which, as discussed in more detail later, have been reversed by Courts of Appeals. The BRB, in analyzing Miller's work as a driver, found that this activity "was not significantly related to maritime activities. Rather, it was an integral part of a land transportation service." While acknowledging that Miller was often required to board vessels in the course of her employment, the BRB determined that her services "were not an integral part of the vessel's ultimate commercial function."

The BRB, not content with merely creating a new test of *commercial function*, then proceeded to reject one of the two alternate tests for status accepted by this Court in *Thibodaux v. Atlantic Richfield Co.*, 580 F.2d 841 (5th Cir. 1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979). In that case, we interpreted the Supreme Court's decision in *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977), as setting forth two alternative tests for coverage such that a claimant will satisfy Section 2(3) if: (1) he was engaged in maritime employment at *the time of injury*; or (2) his overall occupation was one covered by

the Act. While rejecting the "moment of injury" test for maritime employment, the Board also stated that Miller was not engaged in maritime activity at the time of her injury and that her overall occupation, that of driver-courier and security guard, was not an occupation covered by the Act.

Board Member Miller, in a dissent, criticized the Board for "once again ... cast[ing] aside the mandate of our enabling statute that limits our review as to whether the decision below is supported by substantial evidence, rational, and in accordance with law." Based on the ALJ's determination that Miller's duties were "an important if not a necessary service to the shipping industry" and the "congressional mandate that all doubts must be resolved in favor of the claimant", Board Member Miller would find that the claimant had made the requisite showing of coverage. Relying on the *Weyerhaeuser* test, as well as that formulated by the majority of the Board, he found that the claimant's performance of guard duties and transportation brought her within the scope of the Act. "*Traditionally*, the ship's watch function is one performed by a ship's officer or other member of a crew and thus clearly within the scope of ship's service employment as required by *Weyerhaeuser*." Miller also found that Ms. Miller's activities *at the time of her injury* were those that had traditionally been performed by a ship's purser.

While Member Miller takes issue with his colleagues' rejection of the *Thibodaux* moment of injury test, he finds that Claimant Miller's overall activities would satisfy the alternate test in *Thibodaux* or the majority's own test requiring that a substantial portion of an employee's duties be maritime. Specifically, Member Miller, after detailing Ms. Miller's overall duties, found that these services were traditionally performed by members of the crew or by the

---

**7.** The BRB's definition is a modification of that found in *Weyerhaeuser Co. v. Gilmore*, 528 F.2d 957 (9th Cir. 1975), *cert. denied*, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976), which requires that an employee's work must "have a realistically significant relationship to *traditional* maritime activities involving navigation and

commerce over navigable waters" (emphasis added). The BRB specifically stated that the *Weyerhaeuser* definition "is too restrictive, insofar as it requires a relationship to 'traditional' maritime activities and 'the traditional work and duties of a ship's service employment.'"

ship's purser and that Ms. Miller was one of those amphibious workers designed to be covered by the Act. Turning to the services provided by the employer, Miller found that Central contracted with the ships to provide security guard and purser services, services traditionally performed by members of the crew of a vessel. "It would be legally incongruous if changes of the structure of the shipping business which preclude claimant from the traditional status of a seaman or crew member *also* exclude her from coverage under the Act, which covers maritime employees injured over the navigable waters *except those who are members of a crew*." Miller also found that the ALJ's determination was supported by substantial evidence.

Claimant Miller, appealing the decision of the BRB, contends that the BRB erred both in the test it applied to determine coverage and its application of this test. Specifically, the errors of the BRB include incorrect reliance on the prior opinions of the BRB, use of a commercial function test, and rejection of the "moment of injury" test in *Thibodaux*. The Director, Office of Work-

ers' Compensation Programs, a respondent herein but arguing in support of Ms. Miller's claim,[8] also urges us to find that Congress, in amending the LHWCA in 1972, did not intend to withdraw coverage from any workers who would have been covered prior to these amendments. Finding that the work performed by Ms. Miller is an essential service for traditional maritime activities and thus within the scope of the Act, we do not reach the Director's contention that those employees covered under the Act before 1972 are automatically within the ambit of the Act as amended.[9]

## Standard of Review

■ Under the LHWCA, a party aggrieved by an order of the BRB may seek review by the appropriate circuit court. 33 U.S.C. § 921(c). Our review of BRB decisions is limited to considering errors of law, and making certain that the BRB adhered to its statutory standard of review of factual determinations, that is, whether the ALJ's findings of fact are supported by substantial evidence and consistent with the law.[10] *New Orleans (Gulfwide) Stevedores*

---

8. The Director, a respondent in this case, has filed a brief in support of Ms. Miller's claim. The propriety of the Director appearing as a party has been considered by this Court previously. We have held that the Director does not have standing to invoke the jurisdiction of this Court as the petitioner in an appeal of a BRB decision. *See Director, Office of Workers' Compensation Programs v. Bethlehem Steel Corp.*, 620 F.2d 60, 63 (5th Cir. 1980); *Director, Office of Workers' Compensation Programs v. Donzi Marine, Inc.*, 586 F.2d 377, 382 (5th Cir. 1978). While the Director has appeared as a respondent but arguing in support of the claimant in prior cases, *see, e.g., Boudloche v. Howard Trucking Co.*, 632 F.2d 1346 (5th Cir. 1980), *cert. denied*, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981), we have not specifically reached the issue of the Director's appearance as a party respondent as a matter of right, an issue currently pending in 80–2343 *Thornton v. Brown & Root, Inc.* and 81–4032 *Broussard v. Waukesha-Pearce Industries*, consolidated cases orally argued before this Court in February 1982. Since the parties below did not question the Director's role in this litigation and the employer-insurer is a proper party respondent so that the Director's brief in support of Ms. Miller's claim may be properly received as an amicus, we do not have to address the issue here.

9. The Supreme Court did not directly address this issue in *Caputo*.

> This case also does not involve the question of whether Congress excluded people who would have been covered before the 1972 amendments; that is, workers who are injured on navigable waters as previously defined.

*Northeast Marine Terminal Co. v. Caputo*, 432 U.S. at 265 n.25, 97' S.Ct. at 2358 n.25, 53 L.Ed.2d at 334 n.25 (citation omitted). *See Boudreaux v. American Workover, Inc.*, 664 F.2d 463, 466–68 (5th Cir. 1981), *rehearing en banc granted*, 664 F.2d 463, 480 (5th Cir. 1982); *Pippen v. Shell Oil Co.*, 661 F.2d 378 (1981). *But see Boudreaux*, 664 F.2d 463, 469 (Gee, J., dissenting).

10. When the court of appeals reviews decisions of the BRB, then, its only function is to correct errors of law and to determine if the BRB has adhered to its proper scope of review—*i.e.*, has the Board deferred to the ALJ's fact-finding or has it undertaken de novo review and substituted its views for the ALJ's.

*Avondale Shipyards, Inc. v. Vinson*, 623 F.2d 1117, 1119 n.1 (5th Cir. 1980).

*v. Turner,* 661 F.2d 1031, 1037 (5th Cir. 1981); *Alford v. American Bridge Division, U. S. Steel Corp.,* 642 F.2d 807, 809, *modified in part,* 655 F.2d 86, *further modified,* 668 F.2d 791 (5th Cir. 1981); *Hole v. Miami Shipyards Corp.,* 640 F.2d 769, 771–72 (5th Cir. 1981); *Hullinghorst Industries, Inc. v. Carroll,* 650 F.2d 750, 753 (5th Cir. 1981); *Fulks v. Avondale Shipyards, Inc.,* 637 F.2d 1008, 1011 (5th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 633, 70 L.Ed.2d 613 (1981); *Mississippi Coast Marine v. Bosarge,* 637 F.2d 994, 996 (5th Cir. 1981), *modified in part,* 657 F.2d 665 (5th Cir.); *Odom Construction Co. v. U.S. Department of Labor,* 622 F.2d 110, 115 (5th Cir. 1980), *cert. denied,* 450 U.S. 966, 101 S.Ct. 1482 67 L.Ed.2d 614, 101 S.Ct. 1482 (1981); *Avondale Shipyards, Inc. v. Vinson,* 623 F.2d 1117, 1119 n.1 (5th Cir. 1980); *Army & Air Force Exchange Service v. Greenwood,* 585 F.2d 791, 794–95 (5th Cir. 1978); *Presley v. Tinsley Maintenance Service,* 529 F.2d 433, 436 (5th Cir. 1976).

11. The BRB's determination that Miller was not covered under the Act could be viewed in part as a reversal based on both law and fact. While the BRB acknowledged that the ALJ had concluded that Miller performed "an important if not a necessary service to the shipping industry," the BRB stated that "her work was not significantly related to maritime activities."

12. Since the BRB's function in reviewing decisions of the ALJ is akin to that of the District Court under the pre-1972 Act, we see no reason for affording deference to the BRB's construction of legislation pertaining to the LHWCA. Unlike other agency's policy-making bodies, the BRB acts in an adjudicatory not an enforcement capacity. Any deference owed to an agency's construction of its own legislation would be owed to the actions of the Director, as the delegate of the Secretary, who has the administrative responsibilities under the LHWCA. *Alford v. American Bridge Division, U. S. Steel Corp.,* 642 F.2d at 809.

13. Prior to 1972, jurisdiction was satisfied by a single situs requirement that limited coverage to workers whose "disability or death result[ed] from an injury occurring upon the navigable waters of the United States (including any dry dock). . . ." LHWCA of 1927, ch. 509, § 3(a), 44 Stat. 1426. In 1972, when Congress broadened the situs requirement of the LHWCA, extending coverage landward, it added the status requirement. *See Texports*

■ The ALJ's selection of reasonable conflicting factual inferences is conclusive upon the Board if supported by the evidence and not inconsistent with the law. *New Orleans (Gulfwide) Stevedores v. Turner, supra; Alford v. American Bridge Division, U.S. Steel Corp.,* 642 F.2d at 809 n.2; *Presley v. Tinsley Maintenance Service, supra.*

■ In this case, while the BRB largely accepted the factual findings of the ALJ concerning the nature and character of Ms. Miller's work, the Board, based upon these findings, determined that as a matter of law Claimant Miller was not engaged in maritime employment under § 2(3) of the Act.[11] This determination by the BRB is subject to review by this Court for errors of law in its interpretation of the legislation.[12]

*Status Under the Act—Walking on Water*

The LHWCA, as amended in 1972,[13] establishes two essential requirements for coverage under the Act.[14] To receive bene-

*Stevedore Co. v. Winchester,* 632 F.2d 504, 508–511 (5th Cir. 1980) (en banc), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981); *Boudreaux v. American Workover, Inc.,* 664 F.2d at 465–67.

14. Many of our cases have identified a possible third jurisdictional requirement, that concerning the claimant's employer. The LHWCA, as amended in 1972, specifically defines an "employer" as

an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).

33 U.S.C. § 902(4). *See, e.g., Alford v. American Bridge Division, U. S. Steel Corp.,* 642 F.2d at 810–11; *Hullinghorst Industries, Inc. v. Carroll,* 650 F.2d 750, 758 & n.8; *cf. Trotti & Thompson v. Crawford,* 631 F.2d 1214, 1216 & n.5 (5th Cir. 1980). In *Hullinghorst,* we stated that there was some question as to the existence of a separate and independent "employer" status requirement "as a jurisdictional confine", pointing out that if the claimant meets the status requirement, his employer would automatically qualify as a statutory employer. *Hullinghorst, supra.*

Since the BRB found that Miller was not an "employee" within the meaning of the Act,

fits, a claimant must establish that (1) he is an "employee" engaged in "maritime employment" under Section 2(3) of the Act, 33 U.S.C. § 902(3);[15] and (2) his injury occurred on the navigable waters of the United States as defined in 33 U.S.C. § 903(a).[16] The first of these requirements, that of being engaged in maritime employment, is referred to as the "status" test. The second requirement, that of location of the injury, is referred to as the "situs" test. Both status and situs requirements must be satisfied before a claimant may recover benefits under the LHWCA.

The parties have not raised any question as to satisfaction of the situs requirement of the Act since if Ms. Miller was injured on the *STOLT RHINO*, the injury occurred on navigable waters as defined in § 903(a). Thus the issue before us is whether Claimant Miller satisfies the status test, that is whether she was an employee engaged in maritime employment.

Congress' failure to define the term "maritime employment" has resulted in innumerable judicial attempts to interpret the scope of this term. This Circuit has seen its fair share of "status" cases, especially those concerning employees landward of the Jensen [17] line not previously covered by the pre–1972 Act.[18]

■ Under the status test, the essential requirement is that the claimant must be "engaged in maritime employment". Although "maritime employment" is not specifically defined in the Act, the Supreme Court has indicated that this requirement is occupational rather than geographical. *P. C. Pfeiffer Co. v. Ford*, 444 U.S. at 78–81, 100 S.Ct. at 335–36, 62 L.Ed.2d at 233–35. While § 902(3) specifically grants coverage to longshoremen, harbor workers, shipbuilders, etc., the Act encompasses occupations beyond those specifically listed. *P. C. Pfeiffer Co. v. Ford*, 444 U.S. at 77 n.7, 100 S.Ct. at 334 n.7, 62 L.Ed.2d at 233 n.7; *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. at 265 n.25, 97 S.Ct. at 2358 n.25, 53 L.Ed.2d at 334 n.25; *Hullinghorst Industries Inc. v. Carroll*, 650 F.2d at 754; *Trotti & Thompson v. Crawford*, 631 F.2d at 1220; *Odom Construction Co. v. United States*

there was no discussion of whether Central was a statutory "employer". While we do not decide the issue at this point, since we find that Miller was indeed an "employee" under the Act, which determination is based largely on the nature of her work, there would appear to be no issue of whether Central is an "employer" under § 902(4). *P. C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 73–74, 100 S.Ct. 328, 332–33, 62 L.Ed.2d 225, 230–31 (1979); *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. at 265, 97 S.Ct. at 2357, 53 L.Ed.2d at 334; *Boudreaux v. American Workover, Inc.*, 664 F.2d at 465; *Pippen v. Shell Oil Co.*, 661 F.2d at 382; *Thibodaux v. Atlantic Richfield Co.*, 580 F.2d at 843.

15. (3) The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.
33 U.S.C. § 902(3).

16. (a) Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). No compensation shall be payable in respect of the disability or death of—
(1) A master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net; or
(2) An officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof.
33 U.S.C. § 903(a)

17. *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917). *See generally Sun Ship, Inc. v. Pennsylvania*, 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980); *Northeast Marine Terminal Co. v. Caputo, supra*; *Texports Stevedores Co. v. Winchester, supra*.

18. We are presently considering the scope of maritime employment as applied to offshore oil drilling operations in *Boudreaux, supra*, which is pending before this Court en banc. *See* note 9, *supra*.

*Department of Labor*, 622 F.2d at 112. Thus we look to the character of the work, *Northeast Marine Terminal v. Caputo*, 432 U.S. at 268, 97 S.Ct. at 2359, 53 L.Ed.2d at 335, whether the work is maritime, that is, whether the employee's activities had a realistically significant relationship to traditional maritime activity. *Mississippi Coast Marine v. Bosarge*, 637 F.2d at 998, *quoting Weyerhaeuser Co. v. Gilmore*, 528 F.2d at 961. *See Boudreaux v. American Workover, Inc.*, 664 F.2d at 465–66; *Pippen v. Shell Oil Co.*, 661 F.2d at 382; *Odom Construction Co. v. U.S. Department of Labor*, 622 F.2d at 113. "Clearly we must look to the purpose of the work, not solely to the particular skills used." *Trotti & Thompson v. Crawford*, 631 F.2d at 1221 n.16.

In determining maritime employment, this Court has held that status may be based *either* upon the maritime nature of the claimant's activity at the time of his injury or upon the maritime nature of his employment as a whole. *Thibodaux v. Atlantic Richfield Co.*, 580 F.2d at 844. The first alternative, that of the maritime nature at the time of injury has been referred to as the "moment of injury" test. The second alternative, that of the nature of the claimant's employment as a whole, requires only that the claimant spend "some portion" of his overall employment performing maritime activities. *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. at 273, 97 S.Ct. at 2362, 53 L.Ed.2d at 338; *P. C. Pfeiffer Co. v. Ford*, 444 U.S. at 81, 100 S.Ct. at 337, 62 L.Ed.2d at 236.

Thus we have reversed BRB decisions requiring that an employee, to be covered under the Act, spend *a substantial portion* of his duties in maritime employment. *See Boudloche v. Howard Trucking Co.*, 632 F.2d 1346 (5th Cir. 1980), *cert. denied*, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981); *Howard v. Rebel Well Service*, 632 F.2d 1348 (5th Cir. 1980).

*Examining the Specifics*

With this background on the status test and our standard of review in mind, we now consider the nature of Ms. Miller's activities and the opinion by the BRB. We hold that Ms. Miller's activities clearly had a "realistically significant relation to traditional maritime activity" and that she satisfies the test of maritime employment.

In support of the BRB's decision denying jurisdiction, Central argues that none of Miller's activity is indisputably maritime but rather is a "support service" very similar to "transhipment" of stored cargo. Central asserts that Miller "neither worked for an employer involved in maritime activities, nor was she engaged in work of an indisputable maritime nature." Central, like the BRB, relies on two of the BRB's prior cases concerning watchmen, cases which have been reversed subsequently.

The weakness of Central's argument is obvious when we look at the specific tasks performed by Ms. Miller for Central. When Ms. Miller first began working for Central, she performed guard duty, largely of detainees, aboard ship. After about three or four months of these duties, she was assigned to driving a van. As part of her driving of both men and cargo, Miller would board a vessel on an average of five or six times a day. Ms. Miller, in a prehearing deposition, testified that she spent up to 95% of her time driving. She also said that she did not do longshoreman or stevedoring type work, although she did handle inbound cargo. Ms. Miller's testimony was supported by that of another employee of Central, Jerry Roach, who testified that Miller guarded gangplanks, detainees, and served as a courier, taking seamen to doctors, payrolls aboard ships, and cargo.[19]

19. The following exchange between Ms. Miller's counsel and Roach occurred at the hearing before the ALJ:

Q  Will you tell us what her job consisted of when she [Ms. Miller] first went to work for you?

A  When she first went to work, she was just a security officer.

Q  And what did the duties of—would you tell us what the duties of a security officer are?

A  To guard a gangplank, or a detainee, or whatever the case might be. If it was one man, she would guard him aboard ship; or if it was

Roach's testimony, credited by the ALJ, established an awareness that Ms. Miller would be required to board vessels since "everytime you do anything that matters, you have to have a trip log signed by the Captain or even the man, himself.... But, as far as cargo or something like that, you had to go to the First Mate or the Captain, himself....  And of course, we had to pick up payroll at the bank and when we took them to the ship, it had to go directly to the Captain." Central, although it was listed in the yellow pages under "steamship agencies", presented testimony that its actual business was transporting seamen and cargo between vessels and various points on shore "just like a taxi service."

On the day of the injury, Ms. Miller testified that after reporting to work she had gone to a Russian ship docked in the Port of Houston, picked up landing passes for the crew, cleared the passes through Immigration, and returned the passes to the ship. Later that day, she performed some services for Three T's, a shipping firm in the Port of Houston.  Her third and final job of the day was to pick up a South African detainee from the Houston International Airport and take him to the *STOLT RHINO*, and wait for the Captain to accept him. If the Captain did not accept the detainee, Miller was to return him to Immigration.

From the testimony concerning Miller's general duties and those on the day of the injury, it is clear that she was engaged in maritime employment, employment which

has a "realistically significant relationship to traditional maritime activities involving navigation and commerce over navigable waters." *Weyerhaeuser, supra.*  Central provided services to ships which traditionally would have been performed by members of the crew of the vessel and services which support maritime commerce.  Guarding gangplanks and detainees, transporting seamen and delivering payrolls, are all activities which are essential for ocean-going vessels engaged in foreign trade.  Ms. Miller's duties clearly required that she board vessels frequently and as such placed her in the category of amphibious workers whom Congress intended to cover under the LHWCA for shipboard injuries. .

Certainly, the guarding of detainees is an essential service to the maritime industry. The immigration laws of this country specifically provide for inspection of aliens, including alien seamen, empower immigration officers to board vessels, and enable detention of aliens. 8 U.S.C. §§ 1225, 1226, 1227; 8 C.F.R. §§ 235, 236, 252.  Special provisions govern alien seamen.  8 U.S.C. §§ 1281–1287; 8 C.F.R. §§ 252, 253.  The immigration boarding officer may order all or identified seamen detained on board. Failure to detain alien seamen for inspection and after inspection results in a penalty of $1,000 imposed against the "owner, agent, consignee, charterer, master or commanding officer" of the vessel.  In the event a detainee is not on board at the time of a vessel's departure, the vessel, her own-

---

to watch the whole ship, she would stand at the gangplank and hold the ship.

Q  That is the gangplank aboard the vessel, not down on the dock?

A  Not down on the dock.

Q  So, what other duties did she have a little later on?

A  She became a courier.  She took the seamen to doctors, and took payrolls aboard ships, and all the cargo; just a normal procedure.

Q  Did you do these same duties, yourself?

A  Yes, I did.

Q  Okay.  An average day as a courier, how many times did you go aboard a vessel?

A  An average day would be five—five or six times.  ·

Q  And when you went aboard the vessel, to what parts of the vessel would you go?

A  Well, we tried first to go to the Captain's quarters.  Sometimes he wasn't there, and we had to go just find him.  It could just be any part of the ship.

Q  The very forward end of the vessel?

A  If that's where he happened to be, that's where we would have to go.

　　*　　*　　*　　*　　*　　*

Q  Do you know what the work of Mrs. Miller involved?

A  Well—what she did?

Q  Yes, sir.

A  Yes.  She would take the seamen—she would call me and told me she would like to go pick up a seaman and take him to the airport or go pick one up at the airport and take him to the ship ....

ers, and her agents may be liable for significant fines and penalties. 8 U.S.C. § 1284. *See generally* 8 U.S.C. § 1323; 8 C.F.R. § 280 (imposition and collection of fines). Clearance for the vessel generally will not be granted until payment of the fine or sufficient bond. The vessel owner may also be required to pay expenses for deportation of an alien crewman. 8 U.S.C. § 1284(c). To assist vessels in effectuating the detention, shore-based services have been established to furnish ship guards, transportation, and arrangements for keeping the detainees securely ashore and returning the detainees to the vessel as ordered by immigration authorities. The guarding of detainees, required under the immigration laws, is therefore crucial to foreign commerce as conducted over navigable waters.

### The BRB Dispatched

In denying coverage to Ms. Miller, the BRB first focused on that portion of Ms. Miller's duties which consisted of guard duty. The BRB relied on two of its prior cases denying coverage to security guards. In *Holcomb v. Robert W. Kirk and Associates, Inc.*, 11 BRBS, 835, *rev'd*, 655 F.2d 589 (5th Cir. 1981), the Board denied coverage to a night watchman who guarded a vessel docked at a ship repair yard. His duties were generally performed from a pick-up truck, but he frequently boarded the vessel. In reversing the BRB, we found that the watchman's "work was certainly an 'integral part' of and 'directly involved in an ongoing ship repair operation.'" While we indicated in that case that "[w]e do not hold that every watchman of a vessel in navigable waters comes under the Longshoreman's Act", under the facts, it was clear that the watchman met both the situs and status requirements. The facts in *Holcomb*, are not nearly as strong as those in Ms. Miller's case, since Ms. Miller regularly boarded vessels, generally performed her guard duties on board vessels, and rendered services not to a ship repair yard but to service ocean-going vessels.[20] In its opinion, the BRB also relied on its decisions in *Arbeeny v. McRoberts Protective Agency, Inc.*, 12 BRBS 435, and *Conlon v. McRoberts Protective Agency, Inc.*, 12 BRBS 473, both of which cases were reversed in *Arbeeny v. McRoberts Protective Agency, Inc.*, 642 F.2d 672 (2d Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 140, 70 L.Ed.2d 116 (1981). The petitioners in both those cases were employed as pier guards, performing most of their activity from the pier, but at times obliged to board vessels. Their function to protect against loss of cargo was viewed by the Second Circuit as serving a maritime purpose, "the safe transit of goods shipped by sea." Certainly Ms. Miller's function of guarding the gangplank and detainees serves the purpose of insuring the successful performance of the ship's mission.

The BRB next turned to Ms. Miller's driving activities, relying on its opinion in *Boudloche v. Howard Trucking Co.*, 11 BRBS 687, to support lack of coverage—a case we have since reversed. Finally, the BRB attacked our holding in *Thibodaux*, stating: "with respect to the first part of the test propounded in *Thibodaux*, we have rejected the 'moment of injury' as the proper time frame in which to determine the maritime nature of a claimant's employment." For support of its rejection of our precedent, the BRB cites two of its opinions,[21] decisions which were subsequently reversed by this Court. We have not yet rejected the *Thibodaux* alternate test.[22]

---

**20.** In *Holcomb*, we also looked to cases prior to the 1972 amendments to the LHWCA which provided coverage to watchmen. *See Holcomb*, 655 F.2d at 592–93.

**21.** *Boudloche v. Howard Trucking Co.*, 11 BRBS 687, *rev'd*, 632 F.2d 1346 (5th Cir. 1980), *cert. denied*, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981); *Howard v. Rebel Well Service*, 11 BRBS 568, *rev'd*, 632 F.2d 1348 (5th Cir. 1980).

**22.** In *Odom Construction Co. v. U.S. Department of Labor*, while recognizing the *Thibodaux* moment of injury test, we based our holding on the second test in *Thibodaux*, that of overall employment.

Arguably, our decision that Maze is a covered employee could be based solely upon the foregoing conclusion that he was engaged in maritime work at the time of his injury.... We need not rest on this narrow ground, however, but can look at all the circumstanc-

We also must disagree with the BRB's determination that Miller's overall employment is not maritime. The BRB stated: "[w]e are unable to conclude that a claimant who is employed as a driver-courier and security guard would be deemed by the Fifth Circuit as having spent 'at least part of [her] time 'indisputably' as a longshoreman,' or to have the overall status of a maritime employee." Frankly, given our precedent, we are unable to see how the BRB could fail to find Ms. Miller's employment as maritime.

From the nature of Ms. Miller's duties, both at the time of injury and as a whole, it is clear that Ms. Miller is a member of the amphibious group of workers which Congress intended to continue to cover under the 1972 amendments to the LHWCA.

■ Bearing on statutory construction of the Act, the Director pointed out at oral argument, if Ms. Miller is remitted to workers' compensation under the state statute and not covered under the LHWCA, unseaworthiness claims for such shore-based employees may indeed be alive and well, *see Aparicio v. Swan Lake*, 643 F.2d 1109 (5th Cir. 1981). This result would run contrary to the clear Congressional intent under the 1972 amendments to include maritime workers under the Act in exchange for eliminating the right to sue for unseaworthiness. *Sun Ship, Inc. v. Pennsylvania*, 447 U.S. at 724, 100 S.Ct. at 2438, 65 L.Ed.2d at 466. The LHWCA is to be liberally construed and in such a way as to avoid the jurisdictional dilemma which existed prior to the 1972 amendments. *See Sun Ship Inc. v. Pennsylvania*, 447 U.S. at 719–21, 725–26, 100 S.Ct. at 2436–37, 2439, 65 L.Ed.2d at 462–64, 466–67. Claimant Miller's duties, both on the day of the injury and in general, simply cannot be characterized as "in the stream of land rather than maritime commerce".

REVERSED AND REMANDED.

es of Maze's employment. Where, as here, the claimant was doing maritime work that required him to go into the water and where a significant part of the employer's overall work, 20% was maritime, the policy of the Act strongly favors coverage.

622 F.2d at 113 (citations omitted).