IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-60775
_____


COOPER T. SMITH; HOME INDEMNITY CO., INSURANCE CARRIER,

Petitioners,

v.

DIRECTOR, OFFICE OF WORKERS COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR,

Respondent.

_____

Petition for Review of an Order of the
Benefits Review Board
(94-3926)
_____
March 27, 1998
Before KING and JONES, Circuit Judges, and KENDALL, District
Judge.[*]

PER CURIAM:[**]

    Petitioners Cooper T. Smith, Inc. and Home Indemnity Company

have petitioned for review of an Order of the Benefits Review

Board denying petitioners' request for relief pursuant to section

8(f) of the Longshore Workers' Compensation Act, 33 U.S.C.

_____

    [*]    District Judge for the Northern District of Texas,
sitting by designation.

    [**]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

§ 908(f).  For the reasons set forth below, we affirm the judgment of the Benefits Review Board.

## I.  FACTUAL BACKGROUND

On October 28, 1984, Arthur Hudson, an employee of Cooper T. Smith, Inc., injured himself while driving a forklift.  Hudson drove the forklift into a piece of lumber, causing the forklift to turn suddenly.  The force of the impact threw Hudson against the forklift, and he consequently suffered injuries to his neck and left shoulder.

On February 20, 1983, approximately a year and a half prior to his employment-related injury, Hudson underwent a urological evaluation which resulted in a diagnosis of hematuria (blood in the urine).  At the time of his admission to the hospital for the urological evaluation, Hudson complained that he had been experiencing neck pain that radiated into his left arm and hand for the preceding two months.  Hudson reported that he had suffered a neck trauma and a bullet wound in his right shoulder some years earlier.

Dr. Diane S. Gelfand examined Hudson on February 23, 1983, and ordered a cervical spine x-ray, an EMG, and a bone scan.  On February 24, 1983, Dr. Milton J. Guiberteau examined the x-rays of Hudson's cervical spine and identified no focal abnormalities. On February 25, 1983, Dr. Ariel Bar-Sela performed the EMG that Dr. Gelfand had ordered and concluded that the results were

normal.  Dr. Bar-Sela also indicated that the EMG results for Hudson's left shoulder were "peculiar, but certainly not characteristic of radiculopathy," a diseased condition of the spinal nerve roots.   Dr. Bar-Sela diagnosed Hudson with myofascial pain syndrome but noted that he had experienced no loss of muscle strength.  Thereafter, Hudson received physical therapy to relieve the pain in his shoulder and neck six times between February 28, 1983 and March 7, 1983.  After his physical therapy, Hudson worked for Cooper T. Smith, Inc. without medical treatment or restrictions until the time of his employment-related injury.

Following his employment-related injury, a number of physicians examined Hudson.  On April 10, 1985, Hudson underwent a new battery of x-rays of his cervical spine.  Dr. J.E. Martin, the radiologist who reviewed the results stated that they revealed "some straightening of the usual cervical spine" and osteophyte formation "not significantly different" than that revealed by x-rays taken prior to Hudson's employment-related injury.  Dr. Roland Jackson later examined Hudson and concluded that the pain suffered by Hudson resulted from "nerve root compression [in Hudson's neck] due to degenerative changes aggravated by injury."  On March 10, 1986, Dr. Antonio A. Moure examined Hudson and diagnosed his condition as cervical spondylosis that had been aggravated by trauma.  Dr. Moure ordered a CT scan that revealed "degenerative bone and disc

3

disease throughout the majority of the visualized cervical spine." He then performed an operation on Hudson's neck--an anterior discectomy--and eventually discharged Hudson from his care with a permanent partial disability of approximately 20% of his person as a whole.

Hudson was later referred to Dr. Jeffrey Tucker for diagnosis and treatment of his shoulder pain. Dr. Tucker recommended surgery--a subacromial decompression--on Hudson's left shoulder. Hudson underwent this procedure and continued follow-up visits with Dr. Tucker. In November of 1991, Dr. Tucker concluded that Hudson had reached his maximum medical improvement from the surgery, and had a permanent impairment of 7% in his left arm and 4% in his person as a whole.

## II.  PROCEDURAL BACKGROUND

After his work-related injury, Hudson filed a claim for worker's compensation under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901-950. Cooper T. Smith, Inc. and its workers' compensation insurance carrier, Home Indemnity Company (collectively Smith), timely filed an application seeking relief from full liability under section 8(f) of the LHWCA, id. § 908(f).

The first formal hearing was held before Administrative Law Judge Quentin P. McColgin on October 26, 1989. Judge McColgin entered an order granting Hudson benefits on January 11, 1991

4

based on his conclusion that Hudson had reached maximum medical improvement of his neck on October 8, 1986. Because Hudson also suffered from a shoulder injury that could only be remedied by surgery, Judge McColgin concluded that Hudson was temporarily and totally disabled pending maximum medical recovery from the shoulder surgery. Because Judge McColgin made no finding of permanent disability, he declined to address the issue of Smith's entitlement to partial relief from liability under section 8(f).

On February 17, 1994, after Hudson had undergone his shoulder surgery, a second formal hearing was held before Administrative Law Judge George P. Morin. Judge Morin concluded that Hudson had achieved maximum medical recovery from his shoulder surgery on November 22, 1991, and that Hudson was permanently and totally disabled as of that date. Judge Morin entered an order reflecting the change in Hudson's disability status and denying Smith's request for relief under section 8(f).

Smith timely appealed Judge McColgin's denial of its request for relief under section 8(f) to the Benefits Review Board ("BRB") pursuant to 33 U.S.C. § 921(b)(3). Because the BRB did not resolve the appeal within one year and it remained pending on September 12, 1996, the opinion was considered affirmed on that date for purposes of obtaining judicial review pursuant to Pub. L. No. 104-134, § 101(d), 110 Stat. 1321 (Apr. 26, 1996), reprinted in 1996 U.S.C.C.A.N. 1321 (436-37). Smith timely filed its petition for review in this court on November 11, 1996.

5

### III. STANDARD OF REVIEW

This court's review of decisions of the BRB is fairly narrow. "In examining the orders of the BRB our role is limited to '"considering errors of law and making certain that the BRB adhered to its statutory standard of review of factual determinations, that is, whether the ALJ's findings of fact are supported by substantial evidence and consistent with the law."'" Boland Marine & Mfg. Co. v. Rihner, 41 F.3d 997, 1002 (5th Cir. 1995) (quoting Avondale Shipyards, Inc. v. Kennel, 914 F.2d 88, 90 (5th Cir. 1990) (quoting Miller v. Central Dispatch, Inc., 673 F.2d 773, 778 (5th Cir. Unit A 1982))). "This court may not substitute its judgment for that of the ALJ, nor may we reweigh or reappraise the evidence, but may only inquire into the existence of evidence to support the ALJ's factfindings." Empire United Stevedores v. Gatlin, 936 F.2d 819, 822 (5th Cir. 1991) (citations omitted).

### IV. DISCUSSION

"Under the traditional 'aggravation rule' of workers' compensation law, an employer is liable for a worker's entire disability even though the disability was the result of both a current employment injury and a pre-existing impairment." Ceres Marine Terminal v. Director, Office of Worker's Compensation Programs, 118 F.3d 387, 389 (5th Cir. 1997); see also Strachan Shipping Co. v. Nash, 782 F.2d 513, 517 (5th Cir. 1986) (en

6

banc).  "Congress enacted section 8(f) of the LHWCA, 33 U.S.C. § 908(f), to diminish an employer's incentive to discriminate against partially disabled workers out of fear of increased liability under the aggravation rule."  Ceres Marine Terminal, 118 F.3d at 389.

Section 8(f) places a temporal limitation on an employer's obligation to pay worker's compensation benefits in circumstances in which "an employee having an existing permanent partial disability" suffers a subsequent employment-related injury and is thereby left with a "disability [that] is materially and substantially greater than that which would have resulted from the subsequent injury alone."  33 U.S.C. § 908(f); see also Ceres Marine Terminal, 118 F.3d at 389.  After the employer's period of liability expires, payments are made from a "second injury fund" established by section 44 of the LHWCA, 33 U.S.C. § 944, and financed by members of the industry covered by the act.  See Ceres Marine Terminal, 118 F.3d at 389.

This court has held that, in order to be entitled to section 8(f) relief from workers' compensation liability for an employee's permanent total disability, an employer must demonstrate that "(1) the employee had a pre-existing permanent partial disability, (2) the pre-existing permanent partial disability was manifest to the employer prior to the current employment injury, and (3) the current disability was not due solely to the employment injury."  Id. at 389-90; see also Two

7

"R" Drilling Co. v. Director, Office of Workers Compensation Programs, 894 F.2d 748, 750 (5th Cir. 1990).  In this case, the ALJ concluded that Smith was not entitled to second injury fund relief because any pre-existing permanent partial disability that Hudson might have had was not "manifest" at the time of Hudson's work-related injury.[1]  Smith contends that this conclusion was not supported by substantial evidence and thus that the BRB should have reversed the ALJ's judgment.[2]

In support of its contention that the ALJ erred, Smith argues that the following facts demonstrate the manifestness of

---

[1]  The parties disagree as to whether the ALJ found that Hudson had a pre-existing permanent partial disability at the time of his employment-related injury.  The ALJ did not reach the issue of whether Hudson's current disability was due solely to the employment-related injury.  As indicated, infra, we conclude that the ALJ's determination that any pre-existing permanent partial disability that Hudson may have had was not manifest prior to his employment-related injury is supported by substantial evidence. We therefore express no opinion as to whether Hudson actually had a pre-existing permanent partial disability within the meaning of section 8(f).  We likewise decline to address Smith's argument that, as a matter of law, Hudson's permanent total disability was not caused solely by his employment-related injury and that his pre-existing permanent partial disability contributed to his permanent total disability.

[2]  Smith also urges us to abandon the manifestation requirement because it merely constitutes a judicial gloss on section 8(f).  Even if we were inclined to do so, no basis exists for this panel to reject application of the manifestation requirement.  Other panels of this court have accepted and applied the manifestation requirement for over twenty years. See, e.g., Equitable Equip. Co. v. Hardy, 558 F.2d 1192, 1199 (5th Cir. 1977).  "In this circuit one panel may not overrule the decision, right or wrong, of a prior panel in the absence of en banc reconsideration or superseding decision of the Supreme Court."  Pruitt v. Levi Strauss & Co., 932 F.2d 458, 465 (5th Cir. 1991) (internal quotation marks and citations omitted).

Hudson's pre-existing permanent partial disability:  (1) Hudson experienced two months of radiating pain in his neck, shoulder, and arm; (2) he was diagnosed with myofascial pain syndrome; and (3) Dr. Moure testified that Hudson's medical records prior to his employment-related accident reflected degenerative changes in his neck and that these changes were a contributing cause to Hudson's neck, shoulder, and arm pain.  We conclude that the presence of these circumstances does not establish that the ALJ's decision lacked substantial evidentiary support.

"We have previously recognized that a diagnosed, pre-existing disability of which the employer has actual knowledge is manifest."  Ceres Marine Terminal, 118 F.3d at 392.  We have also noted that many other courts have held that an employer's constructive knowledge of a permanent partial disability may be sufficient to establish the manifestness of the disability.[3]  See

_____

[3]  It is arguable that, in Ceres Marine Terminal, which addressed a factual scenario quite similar to the one at issue here, this court implicitly held that constructive knowledge may be sufficient to render a disability manifest for purposes of section 8(f).  While the court did not expressly hold that an employer's constructive knowledge was sufficient to render an employee's disability manifest, it acknowledged that many other courts have done so and remanded for further consideration of the manifestness issue by the ALJ.  See Ceres Marine Terminal, 118 F.3d at 392.  The opinion provides no indication that the record contained any evidence that the employer had actual knowledge of the employee's disability.  In the absence of such evidence, it would have been unnecessary to remand the case to the ALJ for further consideration if the court had not concluded that constructive knowledge could be sufficient to render a disability manifest.  However, because we conclude that Smith lacked even constructive knowledge of any disability that Hudson might have had prior to his employment-related injury, we need not determine

9

id.; Bunge Corp. v. Director, Office of Workers Compensation Programs, 951 F.2d 1109, 1111 (9th Cir. 1991) ("If the condition is readily discoverable from the employee's medical record in the possession of the employer, knowledge of the condition is imputed to the employer."); Director, Office of Workers Compensation Programs v. Berkstresser, 921 F.2d 306, 310 (D.C. Cir. 1990) ("When the evidence shows that such a 'disability' was objectively apparent, the 'manifest' requirement has been met."). Under this approach, "[t]he question is whether the condition was discoverable by the employer based on then existing medical records available to it." Eymard & Sons Shipyard v. Smith, 862 F.2d 1220, 1224 (5th Cir. 1989). We have noted that "[a] clear diagnosis in such records would, of course, meet this test." Id. We have also "assume[d], arguendo, that there may be instances where although a diagnosis as such is not expressly stated in the medical records nevertheless sufficient unambiguous, objective, and obvious indication of a disability is reflected by the factual information contained in the available records so that the disability should be considered manifest even though actually unknown to the employer." Id.

Making the same assumption here, we believe that the ALJ could properly conclude that Hudson's medical records were not so

whether Ceres Marine Terminal stands for the proposition that constructive knowledge can establish manifestness or, if it does not, whether this circuit should adopt such a rule.

10

"unambiguous, objective, and obvious" in their indication of a disability that his pre-existing permanent partial disability, if any, was manifest to Smith prior to Hudson's employment-related injury.  The results of the cervical spine x-ray, bone scan, and EMG that Hudson received prior to his employment-related injury were largely normal.  Dr. Guiberteau concluded that Hudson's x-rays revealed no focal abnormalities.  Dr. Bar-Sela concluded that Hudson's neuromuscular electrodiagnostic study was normal and that the EMG results for Hudson's shoulder were "peculiar, but certainly not characteristic of radiculopathy."  Hudson received just over a week of physical therapy for his shoulder and neck pain and then returned to work without medical treatment or restriction until the time of his employment-related injury.

Smith contends that "the unrefuted deposition testimony of Dr. Moure that the medical records in this case reflected pre-existing degenerative changes in [Hudson's] neck" indicates that Hudson had a pre-existing permanent partial disability that was manifest to Smith prior to Hudson's employment-related injury.  However, Dr. Moure's report regarding the CT scan that he ordered for Hudson indicates that Hudson's medical records prior to his employment-related injury did not contain "unambiguous, objective, and obvious indication of a disability."  Eymard & Sons Shipyard, 862 F.2d at 1224.  In that report, Dr. Moure states the following:

11

> I am aware of the prior cervical spine MRI study which was interpreted as normal. <u>Upon reexamination of the study, I still find it very difficult to identify the abnormalities observed on the cervical spine CT or the MR scan.</u> I am at a loss to explain the reason for differences between the scan findings but the positive findings on the cervical spine CT should supersede the presumably erroneous MR study. (emphasis added).

Moreover, even if we were to assume that, based solely upon Hudson's medical records prior to his employment-related injury, Dr. Moure would have diagnosed Hudson with degenerative disc disease, the ALJ could still properly conclude that any pre-existing permanent partial disability that Hudson might have had was not manifest. "The fact that another physician might have diagnosed the disease is not determinative." See <u>Eymard & Sons Shipyard</u>, 862 F.2d at 1224. We therefore conclude that substantial evidence supports the ALJ's finding that Hudson's pre-existing permanent partial disability, if any, was not manifest to Smith prior to Hudson's employment-related injury.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the BRB's decision to affirm the judgment of the ALJ.